Meriel L. Darzen (OSB # 113645)
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214
meriel@crag.org | (503) 525-2725

John S. Persell (OSB # 084400)
Oregon Wild
5825 N Greeley Ave.
Portland, OR 97217
jp@oregonwild.org | (503) 896-6472

Nicholas S. Cady (OSB # 113463)
Peter D. Jensen III (OSB # 235260)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
nick@cascwild.org | peter@cascwild.org
(541) 434-1463

*Attorneys for Plaintiffs*

---

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

---

**CASCADIA WILDLANDS,** an Oregon non-profit organization; **OREGON WILD,** an Oregon non-profit organization; and **UMPQUA WATERSHEDS,** an Oregon non-profit organization,

               Plaintiffs,

    v.

**UNITED STATES BUREAU OF LAND MANAGEMENT**, a federal agency,

               Defendants.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Case No.: 6:24-cv-01641

(Environmental Matters – Violations of Federal Land Policy and Management Act; National Environmental Policy Act; Administrative Procedure Act)

## GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BLM | Bureau of Land Management |
| BiOp | Biological Opinion |
| Cascadia | All named Plaintiffs |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | Fish and Wildlife Service (US) |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserve |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NSO | Northern Spotted Owl |
| Northwestern RMP | 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan |
| NRF | Nesting, roosting, and foraging habitat |
| Programmatic FEIS | 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
| RMP | Resource Management Plan |
| RR | Riparian Reserve |
| Blue and Gold Harvest Plan | Blue and Gold Harvest Plan |
| Southwestern RMP | 2016 Southwestern Oregon Record of Decision and Resource Management Plan |
| VRH | Variable Retention Harvest |
| WDA | Wildland Developed Areas |

## NATURE OF ACTION

1.    Plaintiffs Cascadia Wildlands, Oregon Wild, and Umpqua Watersheds (collectively, "Plaintiffs" or "Cascadia") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to the final administrative action of the Bureau of Land Management, Roseburg Oregon District, Swiftwater Field Office (collectively, "BLM" or "Defendant"). In issuing the Blue and Gold Harvest Plan Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and the Galagher Canyon and Tidy Bowl Timber Sales Decision Record ("DR") to implement the Blue and Gold Harvest Plan ("Blue and Gold Plan" or "Project"), Defendant acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and in violation of the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 302 *et seq*.

2.    The Blue and Gold Project approves up to eight years of logging on approximately 3,237 acres of BLM-administered lands in Douglas County near Sutherlin and Yoncalla, Oregon. The Project Area, which spans eight separate watersheds, contains structurally complex, late-successional forest habitat; large and old trees; and several species of fish and wildlife protected under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, including northern spotted owls, marbled murrelets, Oregon Coast coho salmon, steelhead trout, and western pond turtles.

3.    The Blue and Gold Project area, located in the Coast Range of Western Oregon, is extensive and includes large, contiguous, unlogged, mature and old-growth forest. Such forests are incredibly rare. BLM's proposed logging will irreparably damage these areas by permanently converting these areas into plantations designed to be logged in perpetuity. This will remove old-growth trees, introduce noxious weeds, damage watersheds, and remove habitat for imperiled species.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-1

4.    Not only will this logging permanently remove unique old-growth habitat relied upon by federally protected species, but the conversion of these areas into plantations will eliminate carbon stores and exacerbate wildfire risk and hazards in the region.

5.    BLM consistently asserts it no longer logs old growth on public lands. Yet here it proposes to target some of the most pristine mature and old-growth forests remaining on BLM-managed public lands in Oregon amidst a nationwide process to inventory and conserve mature and old-growth forests spurred by executive order and other federal directives.

6.    BLM failed to conform its action to its own Resource Management Plan ("RMP") and violated NEPA by undertaking a rushed and incomplete planning process defined by haphazard, unsupported, and arbitrary decision-making.

7.    BLM appears aware of national efforts to protect the old-growth forests targeted in the Blue and Gold Project and is sprinting forward with its proposed logging here to get in front of those efforts. The U.S. Fish and Wildlife Service (FWS) was given 30 days to review the project, and BLM purportedly considered thousands of public comments in under a month. Surveys for federally listed species under the Endangered Species Act have not been completed or were incredibly rushed.

8.    BLM's analysis in the FONSI and EA was incomplete and cursory and intentionally obscured the presence of ancient trees and forests that, if acknowledged and disclosed, would prevent the logging of these old-growth areas.

9.    BLM has specifically identified and begun to prepare timber sales relying on the Blue and Gold Project EA and FONSI, with an auction scheduled for September 30, 2024. BLM is relying upon logging these areas to meet this fiscal year's timber volume quota.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-2

10.    The rapid pace, dismissive process, and severe risks to the environment presented by the Blue and Gold Project, and the BLM's failure to respond to repeated comments and questions from the public, now necessitates judicial intervention to prevent the imminent and irreparable harm associated with liquidating what is undoubtedly some of the most unique and ancient forest remaining on Western Oregon public lands.

11.    Accordingly, this action seeks a declaration that BLM violated FLPMA, 43 U.S.C. §§ 302 *et seq.*, and NEPA, 42 U.S.C. §§ 4321 *et seq.*, and associated implementing regulations by a) failing to conform its action to the governing RMP and required management direction, b) failing to prepare an environmental impact statement ("EIS"), c) and failing to take a hard look at the environmental consequences of its action. Accordingly, Plaintiffs specifically request the vacatur of the Project EA, FONSI, and DR.

12.    The requested relief is necessary to prevent unlawful agency action and forestall irreparable injury to Cascadia and the environment. If necessary, Cascadia intends to seek preliminary injunctive relief during the pendency of this litigation.

13.    Should Cascadia prevail, Cascadia will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (Federal Question) and 1346 (United States as Defendant). Final agency action has occurred that is subject to judicial review pursuant to 5 U.S.C. §§ 704–706. An actual, justiciable controversy exists between Plaintiffs and Defendants. The Court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15.   This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701 *et seq.*, FLPMA, 43 U.S.C. §§ 302 *et seq*., and NEPA, 42 U.S.C. §§ 4321 *et seq.*

16.   Plaintiffs have exhausted their administrative remedies through timely participation in BLM's planning process for the Blue and Gold Harvest Plan. The release of the EA and FONSI and the first Decision Record constitutes a final agency action subject to review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

17.   Venue in this Court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to this litigation occurred within this judicial district. BLM officials who authorized the decisions at issue maintain offices within this judicial district. The decisions at issue were developed and signed within this judicial district.

18.   This case is properly filed in the Eugene Division pursuant to Local Rule 3-2. Defendants' office, where the EA, FONSI and Decision Record were signed and the Blue and Gold Harvest Project Area are located, is in Douglas County, Oregon. The events and omissions giving rise to this claim occurred are thus situated within the Eugene Division.

## **PARTIES**

19.   Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascade Bioregion.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-4

20.  Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon, and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and vital fish and wildlife habitat across Oregon.

21.  Plaintiff UMPQUA WATERSHEDS is a non-profit corporation headquartered in Roseburg, Oregon, with members throughout Oregon. Since 1986 the organization has been dedicated to protecting and restoring the Umpqua watershed and forest lands through education, training, advocacy, and ecologically responsible stewardship. Umpqua Watersheds and its members, staff, and supporters frequently experience and appreciate the aesthetics of the forest and its wildlife. Umpqua Watersheds is headquartered near the project area, which its members have used and will continue to use for activities such as hiking, rafting, camping, wildlife observation and research, and nature photography.

22.  Plaintiffs and their members, supporters, and staff have concrete aesthetic, recreational, spiritual, scientific, and professional interests in the Blue and Gold Project Area.

23.  Plaintiffs' members, supporters, and staff regularly visit and enjoy the Blue and Gold Project Area—including areas in which BLM is currently preparing timber sales—and have concrete plans to do so in the future. Plaintiffs' members, supporters, and staff use the Project Area to recreate, enjoy nature, attempt to observe wildlife (including northern spotted owls, marbled murrelet, and Oregon Coast coho salmon), photograph wildlife and forest ecosystems, and otherwise enjoy the aesthetics and scientific bounty of the Blue and Gold Project Area.

24.  Plaintiffs' members, supporters, and staff intend to return to the Blue and Gold Project Area in the near future to recreate and otherwise enjoy the Project Area. Plaintiffs' members, supporters, and staff are less likely to revisit the Project Area if the Blue and Gold Project is implemented as approved; when Plaintiffs' members, supporters, and staff do return, their ability to observe wildlife and intact forest ecosystems will be significantly and permanently impaired by the Project activities.

25.  Plaintiffs and their members, supporters, and staff would sustain concrete injury to their aesthetic, recreational, spiritual, scientific, and professional interests in the Blue and Gold Project Area if BLM implements the Blue and Gold Project as authorized.

26.  Plaintiffs have organizational interests in the proper and lawful management of the Project Area. Plaintiffs and their members, supporters, and staff have actively participated in the Project's administrative processes. Plaintiffs and their members, supporters, and staff expend significant resources to track management activities on these lands, comment on agency proposals, work with BLM staff on the development of land management plans, and field-check federal projects on these lands.

27.  During the comment periods, Plaintiffs submitted extensive comments as well as scientific literature that conflicts with BLM's conclusions. BLM did not substantively respond to many of Plaintiffs' concerns or address opposing evidence. Plaintiffs and their members, supporters, and staff are thus procedurally harmed by BLM's failure to comply with federal law.

28. Additionally, Plaintiffs' injuries are predicated on unlawful BLM actions that have diminished the trust between BLM and the conservation community, led to uninformed management and decision-making—threatening imminent and significant environmental harm, and injury to Plaintiffs and their interests.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-6

29.  Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations. It issued the Blue and Gold EA, FONSI, and DR authorizing the Project and associated timber sales.

## LEGAL BACKGROUND

**Administrative Procedure Act**

30.  The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

31.  Upon review under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

**Federal Land Policy and Management Act**

32.  Congress enacted FLPMA in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). In enacting FLPMA, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." *Id.* at (a)(8).

33.   FLPMA requires BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

34.   BLM issued the Northwestern and Coastal Oregon RMP in 2016 which pertains to lands administered by the Swiftwater Field Office of BLM's Roseburg District. Accordingly, the final 2016 Northwestern and Coastal Oregon RMP ("Northwestern RMP") and its associated management directions and analysis apply to and govern the timber sales authorized by the Blue and Gold Harvest Plan.

**National Environmental Policy Act**

35.   Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

36.   To accomplish these purposes, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

37.   NEPA requires federal agencies to prepare, consider, publicly disclose, and approve a "detailed statement" describing the environmental impacts of and alternatives to any major federal action that may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). This detailed statement, known as an "Environmental Impact Statement," or

"EIS," must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts." *See* 40 C.F.R. §§ 1508.11, 1502.1. The agency must release its analysis to the public before concluding its decision-making process or committing resources to the project. 40 C.F.R. § 1500.1(b).

38.  If the agency is uncertain whether a proposed action may have a significant effect on the human environment, the agency may prepare an Environmental Assessment, or "EA." 40 C.F.R. § 1501.4(b). An EA should be a concise public document that briefly describes the proposal, examines reasonable alternatives, and considers the potential significance of environmental impacts. 40 C.F.R. § 1508.9.

39.  Whether in an EIS or EA, an agency must take a "hard look" at the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1502.16, 1508.7.8. Direct impacts are those that are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8(a). Indirect impacts are also caused by the action but occur later in time or are farther removed in distance. 40 C.F.R. § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions, both federal and non-federal. *Id*. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id*.

40.  In determining whether a proposed action may have a "significant" environmental effect, an agency must consider its context and intensity. 40 C.F.R. §§ 1508.8, 1508.27.[1] An

---

[1] The Council on Environmental Quality ("CEQ") promulgates uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500–1508.8 (2019). This complaint cites to the 2019 version of these regulations, on which BLM relied in developing and approving the Blue and Gold Project.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-9

action's "intensity" depends on several factors, including impacts that may be both beneficial and adverse; the degree to which the proposed action affects public health or safety; the unique characteristics of the relevant geographic area; the degree to which the environmental effects are likely to be highly controversial; the degree to which the environmental effects are highly uncertain or involve unique or unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and whether the action threatens to violate federal, state, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b)(1)-(10) (1978).

41.  NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. To determine which aspects may require analysis, an agency should look to the considerations and values expressed in the substantive statute driving or enabling the proposed action. If a particular resource value is addressed by the substantive statute, it is relevant to the analysis and must be duly considered by the agency.

42.  If the agency concludes that the action may have a significant impact, it must prepare an EIS. If the agency does not prepare an EIS, it must still undertake a thorough environmental analysis and supply a convincing statement of reasons explaining why the project's impacts will not be significant.

43.  CEQ regulations encourage agencies to "tier" their NEPA documents to eliminate repetitive discussions of the same issues. 40 C.F.R. §§ 1502.20; 1508.28. After a programmatic analysis is completed, a subsequent environmental review may incorporate the earlier analysis by reference and "concentrate on the issues specific to the subsequent action." *Id*.

44.  Courts view tiered analyses as a whole when determining whether they adequately

address all impacts, and may reject the subsequent NEPA analysis if a significant issue is not fully considered in either document. An agency must conduct a site-specific analysis of the proposed action and its effects—a general overview of possible effects over a broad planning area is an insufficient level of detail at the project level.

**Endangered Species Act**

45.   The Endangered Species Act ("ESA"), enacted in 1973, is meant to provide a means to conserve the ecosystems upon which endangered and threatened species depend and to provide a program to conserve such species. 16 U.S.C. § 1531(b).

46.   To receive ESA protections, a species must first be listed as "endangered" or "threatened" by either the U.S. Fish and Wildlife Service ("FWS") (for terrestrial species) or the National Marine Fisheries Service ("NMFS") (for marine and anadromous species). 16 U.S.C. § 1533.

47.   The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range," and a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future in all or a significant portion of its range." 16 U.S.C. § 1532(6), (20); *id.* § 1533(a)(1)(A)–(E); 50 C.F.R. § 402.01(b); 50 C.F.R. §§ 17.11, 17.12. Threatened species generally receive the same protections as endangered species. 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31(a).

48.   The ESA prohibits "take" of endangered species. 16 U.S.C. § 1538(a). Among other things, "take" means to "harm" and "kill." *Id.* § 1532(19). The take prohibition has been extended to threatened species unless otherwise specified by regulation. 50 C.F.R. § 17.31(a).

49.   FWS and NMFS must also designate "critical habitat" for listed species. 16 U.S.C. § 1533(a)(3)(A)(i). "Critical habitat" means "the specific areas . . . on which are found those

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-11

physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(i).

50. The ESA requires each federal agency, in consultation with FWS or NMFS, to ensure that any proposed action is not likely to jeopardize the continued existence of a threatened or endangered species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2). To make this determination, the agencies must "use the best scientific and commercial data available." *Id.*

51. Formal consultation is required if an action agency determines a proposed action is likely to adversely affect a listed species or designated critical habitat. 50 C.F.R. § 402.14(a) & (b)(1).

52. In order to determine whether an action is likely to adversely affect a listed species or critical habitat, an action agency must prepare a biological assessment. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12(a).

53. A biological assessment must "evaluate the potential effects of the action" (direct, indirect, and cumulative—additive to the environmental baseline). 50 C.F.R. § 402.12(a); *Id.* § 402.12(f)(4).

54. At the conclusion of formal consultation, the consulting agency must issue a "biological opinion" explaining whether the proposed action is likely to result in jeopardy to the listed species or destruction or adverse modification of critical habitat. *Id.* § 402.14(g)(5) & (h); 16 U.S.C. § 1536(b)(3)(A). If the consulting agency reaches a "no jeopardy" determination, it may exempt from liability incidental take of the species through an incidental take statement. 16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(i)(1)(i).

55.    Consultation alone does not satisfy an action agency's duty under the ESA. An action agency must also independently ensure that its actions do not result in jeopardy or adverse modification of critical habitat and may not rely on a legally flawed biological opinion.

**Oregon and California Revested Lands Act of 1937 ("O&C Act")**

56.    Enacted in 1937, the O&C Act provides that certain revested railroad lands in western Oregon "classified as timberlands . . . shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the princip[le] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 2601.

/

/

**Executive Order 13990**

57.    On his first day in office, President Biden issued Executive Order ("EO") 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, affirming that federal agencies must "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." 86 Fed. Reg. 7,037. Sec. 5 (Jan. 20, 2021). Calculating and disclosing the "accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions." *Id.*

58.    To assist federal agencies in implementing EO 13990, an Interagency Working Group issued interim estimates of the social cost of carbon (SCC) in February of 2021. As the Group noted, many agencies had been regularly incorporating the social cost of carbon into their cost-benefit analyses since 2008. EO 13990 merely formalized the practice, and the interim

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-13

estimates were simply updates to the previously used formulae, reflecting the immediate need to have an operational SCC for agencies to apply.

59.  On January 9, 2023, CEQ issued interim guidance for analyzing greenhouse gas emissions under NEPA. 88 Fed. Reg. 1,196 (Jan. 9, 2023). Effective immediately, CEQ directed agencies to provide additional context for greenhouse gas emissions in their NEPA analyses, "including through the use of the best available social cost of [greenhouse gas] estimates," in order to "help evaluate the significance of an action's climate change effects[] and better understand the tradeoffs associated with an action and its alternatives." *Id.* at 1,198.

**Executive Order 14072**

60.  On Earth Day 2022, President Biden issued EO 14072, *Strengthening the Nation's Forests, Communities, and Local Economies*, which emphasized the importance of mature and old-growth forests on Federal lands for community resilience, carbon sequestration, and biodiversity. *See* 87 Fed. Reg. 24,851 (April 22, 2022). EO 14072 thus articulated a federal policy of "conserv[ing] America's mature and old-growth forests on Federal lands." *Id.*

## FACTUAL BACKGROUND

**The 2016 Northwestern Oregon Resource Management Plan**

61.  The Northwestern RMP provides overall direction for the management of all resources on approximately 1.3 million acres of BLM-administered lands, including lands within the Swiftwater Field Office and the Project Area.

62.  BLM adopted the Northwestern RMP after preparing a Final Environmental Impact Statement ("programmatic FEIS") which analyzed both the Northwestern RMP and the Southwestern Oregon RMP ("Southwestern RMP"), which covers an additional 1.2 million acres of BLM-administered lands in southern Oregon. The programmatic FEIS thus broadly described

and analyzed a total of 2.5 million acres across Oregon. Vegetation, hydrology, geology, wildlife populations, fire history, proximity to human development, and past resource use vary widely across this enormous planning area.

63.   The management objectives of the Northwestern RMP include, in part, providing a sustained yield of timber, enhancing the health and resilience of forest stands, preventing the introduction of invasive species, contributing to the conservation and recovery of threatened and endangered species, providing clean water in watersheds, and restoring fire-adapted ecosystems. These objectives guide the management decisions for all BLM lands in Northwestern Oregon.

64.   To achieve these objectives, the Northwestern RMP imposes substantive standards and guidelines for managing a broad range of resource values.

65.   The Northwestern RMP divides BLM-administered land between five specific land use allocations: Congressionally Reserved Lands and National Conservation Lands, District-Designated Reserves, Late-Successional Reserves ("LSRs"), Riparian Reserves, and Harvest Land Base ("HLB"). Each allocation has different management objectives and directions that identify which future actions may or may not be allowed within a particular area.

66.   The Blue and Gold Project Area primarily consists of lands categorized as HLB, though the Project Area also contains and intersects Riparian Reserves and LSRs.

67.   Management directives specific to the HLB include conducting silvicultural treatments to enhance timber values and reduce fire risk, to restore and maintain habitat for sensitive species, to provide complex early-seral ecosystems, to promote the development of structural complexity, to meet snag retention and creation levels; and to retain large trees.

68.   Specifically, within HLB the RMP requires BLM to retain "all trees that are both ≥ 40" diameter at breast height (dbh) and that the BLM identifies were established prior to 1850,

except where falling is necessary for safety or operational reasons and no alternative harvesting method is economically viable or practically feasible. If such trees need to be cut for safety or operational reasons," BLM must "retain cut trees in the stand." This requirement is more generally referred to as BLM's requirement to protect old growth.

69.   The requirement to protect old growth applies in the Riparian Reserves as well. Any logging or associated operations in Riparian Reserves must be designed to maintain and restore natural channel dynamics, processes, and the proper functioning condition of riparian areas, stream channels, and wetlands by providing forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates. Management objectives for Riparian Reserves also include the maintenance of water quality and streamflows within the range of natural variability, and goals of protecting aquatic biodiversity and quality water for contact recreation and drinking water sources.

70.   BLM is currently prohibited from "taking" northern spotted owls through timber harvest. As part of the process to determine whether a planned timber harvest would result in take of northern spotted owls, the RMP requires BLM to establish whether the northern spotted owl is actually present in the area that will be affected by the timber harvest using the best available science at that time.

71.   To accurately assess and mitigate negative impacts to marbled murrelets, the RMP includes management directions pertaining to marbled murrelets. These management directions apply to all reserve allocations in Zone 2, areas 35 to 50 miles from the coast, including Riparian Reserves. These management directions require the BLM, prior to modifying murrelet nesting habitat, to survey for murrelets, designate occupied sites pursuant to those survey results, and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-16

buffer these occupied sites by 300 feet. Logging activities that occur in Harvest Land Base areas adjacent to suitable murrelet nesting habitat will modify the function of that nesting habitat. No activities are permitted within the designated occupied sites or corresponding buffer.

72.  BLM is required to demonstrate how any project developed under the Northwestern RMP will follow relevant management directions to achieve the RMP's objectives. This includes site-specific analyses of landscape characteristics—including wildlife populations, snags, stand density and conditions, tree diameter and age, invasive species infestations, extent of detrimental soil disturbance, water quality, and availability of wildlife habitat. In approving site-specific projects, BLM must ensure compliance with the RMP's substantive standards and guidelines.

/

**<u>The Blue and Gold Project and Planning Process</u>**

73.  The Blue and Gold Harvest Plan authorizes variable retention regeneration harvest, commercial thinning, and road building and yarding activities to facilitate this logging—on 3,237 acres of BLM-administered forestland near Yoncalla and Sutherlin, Oregon.



**Map** 1. Blue and Gold Harvest Plan Vicinity Map

74.  The Project will negatively affect wildlife habitat, carbon storage and greenhouse gas emissions, sensitive wildlife species and their habitat, wildfire, and water quality and quantity throughout the Project Area.

75.  On December 6, 2019, the Swiftwater Field Office began scoping the Project. BLM notified the public of the Blue and Gold Harvest Plan on July 8, 2020.

76.  Cascadia timely submitted scoping comments outlining concerns and questions that persist today.

77.  BLM released its Environmental Assessment (EA) and an unsigned Finding of No Significant Impact (FONSI) on July 3, 2024, and opened public comment on the draft documents.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-18

78. BLM received 1,707 comments, including those timely submitted by Cascadia on August 22, 2024.

79. Cascadia raised a number of issues, noting, *inter alia*, that the proposed Blue and Gold Harvest Plan would have significant impacts to wildlife habitat, invasive species, water quality, wildfire hazard, sensitive plant species and wildlife, and climate change and carbon; that BLM had arbitrarily excluded these issues from detailed analysis; that the EA did not contain adequate site-specific information; that the EA did not contain adequate analysis of cumulative impacts; that BLM failed to reconcile the project with relevant executive orders and federal policy processes to inventory and conserve mature and old-growth forest; and that BLM should therefore prepare an EIS to fully analyze and disclose the Project's potential impacts.

80. In Cascadia's comments, they outlined relevant scientific literature, summarized field-checking and on-the-ground analysis, observations, and project descriptions, and expressed both substantive and procedural concerns with the Project and BLM's planning process.

81. For example, Cascadia identified that to comply with NEPA, BLM needed to prepare an EIS that thoroughly analyzed the site-specific impacts (direct, indirect, and cumulative) associated with the Blue and Gold Harvest Plan.

82. Cascadia identified RMP-driven resource issues that required further site-specific analysis before implementation could occur, such as Bureau Sensitive Species, to comply with NEPA and ensure its project would not violate FLPMA.

83. Specifically, FLPMA, as implemented through the Northwestern RMP, requires BLM to manage for ESA-listed species and habitat, Bureau Sensitive Species, wildfire resilience, water quality, and carbon storage. All of these values are therefore relevant to the

agency's NEPA analysis of the Blue and Gold Harvest Plan, but BLM nonetheless dismissed them from detailed review.

84. Cascadia specifically asked BLM to conform the Blue and Gold Project to the federal policy articulated in President Biden's executive order directing the agency to conserve mature and old-growth forests on federal lands.

85. Cascadia also specifically asked BLM to follow the most recent 2023 CEQ guidance for analysis of the actions' climate change impacts, including quantification of the social cost of greenhouse gas emissions.

86. Cascadia also commented that BLM must conform the Blue and Gold Project to the agency's own recently promulgated Public Lands Rule, which emphasizes the protection of existing healthy and intact landscapes. *See* 89 Fed. Reg. 40,308 (May 9, 2024).

87. Cascadia identified that BLM's description of existing conditions or the environmental baseline was inaccurate and deficient, and submitted unit-by-unit descriptions, photographs, and updates to aid the agency and inform the development of this project.

88. For example, Cascadia outlined that BLM's tree age and stand conditions were inaccurate, submitting pictures, measurements, and observations outlining and confirming trees were far older than described by BLM and that its descriptions of units, stands, and habitat in Project documents were otherwise inconsistent with on-the-ground conditions.

89. Cascadia noted BLM's inadequate analysis of carbon and climate resilience and outlined considerations, policy directives, executive orders, and scientific studies missing from BLM's carbon and climate analysis.

90. Cascadia outlined how the project would likely result in unauthorized take of NSO and marbled murrelets, as well as adversely impact these species and their habitat.

91.  Specifically, Cascadia outlined issues with surveys and habitat classifications for these species and described harm to these species and their habitat.

92.  Neither BLM's Biological Assessment (BA) nor the Biological Opinion ("BiOp") or Verification Letter from the relevant consulting agencies were available for review during the comment period/NEPA process.

93.  Before the comment period closed, Cascadia requested the BA from BLM as well as from FWS to better understand the project's potential impacts on listed species. Both agencies refused to provide the public document.

94.  Cascadia had to submit their comments without the benefit of any of the relevant consultation documents.

95.  On August 23, 2024, Cascadia submitted a Freedom of Information Act ("FOIA") request for the BA. BLM never produced documents in response to this request.

96.  On September 13, 2024, BLM authorized the Blue and Gold Harvest Plan, issuing a Decision Record, signed FONSI, and final EA, and contemporaneously released the BA and FWS's BiOp.

97.  The final project documents authorize logging, road-building, and fuels treatment on primarily HLB lands within the Mehl Creek-Umpqua River, Brush Creek, Yoncalla Creek, McGee Creek-Umpqua River, Yellow Creek, Lost Creek-Umpqua River, Williams Creek-Calapooya Creek, and Cabin Creek-Calapooya Creek Class I subwatersheds near the communities of Yoncalla (two miles from the project's northern edge), Sutherlin (four miles from the eastern edge), and Oakland (five miles from the eastern edge).

98.  The described "purpose and need" for the project is to:

[C]onduct[] silvicultural treatments as analyzed in the Blue & Gold Harvest Plan EA is to implement the HLB LUA management direction to meet the need for ASQ

volume in a manner that provides economically viable sales and efficient timber sale planning and to contribute ASQ timber volume of approximately 59 to 158 MMbf of ASQ volume over the next three to eight years.

99.   The Blue and Gold Harvest Plan project area includes approximately 2,625 acres of HLB proposed for logging. The Project will also remove forest stands on up to 738 acres of Riparian Reserves for yarding.

100. BLM asserts that the stands being proposed for treatments range in age from 40 to 140 years. It describes the older forest areas in this spectrum as exhibiting a "single, dominant cohort of Douglas-fir, suggesting a stand-replacement disturbance around the turn of the 20th century." BLM at the same time acknowledges that "stand structure varies throughout the analysis area due to differences in management and disturbance history as well as site characteristics."

101.Many of the older forest areas survived the fire that occurred in the area around 120 or 150 years ago. This forest structure is well over 300 years old. There is little to no evidence of prior logging in these areas. Individual trees in the area have been documented closer to 1,000 years old. This old-growth forest structure is not just scattered individual trees, but exists in large, contiguous blocks or groves. In many areas, especially the areas around Yellow Creek, this old-growth structure is the predominant forest structure.

102. BLM states that "BLM-Identified Trees Established Prior to 1850" will be felled for safety and/or operational reasons. Where the trees are cut for safety and operational reasons, these trees will be left on site as coarse woody debris. BLM will also log "trees that are both greater than or equal to 40 inches DBH and that the BLM identifies were established before 1850," for yarding corridors, skid trails, or road construction, maintenance, and improvements. These trees will be sold at BLM's discretion. These trees established prior to 1850 and greater

than or equal to 40 inches DBH that are felled or could be felled during logging operations BLM will count towards overall retention requirements.

103. BLM considered a "no action" alternative along with six action alternatives in the Blue and Gold EA.

104. The finding of no significant impact (FONSI) indicates that BLM would prefer to implement Alternative 6, a mixture of variable retention harvest and commercial thinning.

105. All alternatives authorize heavy logging and substantial roadbuilding.

106. All alternatives adversely affect federally listed threatened species and increase fire hazard.

107. In evaluating these alternatives, BLM analyzed only the following issues in detail: contribution of timber harvest to Allowable Sale Quality for the Roseburg District; impacts on NSO and their habitats; impacts on marbled murrelets and their habitats; impacts of regeneration harvest on streams' low flow levels; impacts from installation of a road crossing across Yellow Creek on Oregon Coast coho salmon and designated critical habitat; and impacts on fire hazards on BLM-administered lands in close proximity to Wildland Developed Areas (WDAs) and on overall wildfire risk.

108. BLM declined to analyze the following eleven issues in detail, in addition to those not expressly listed: impacts on fire risk from residual activity fuels on BLM-administered lands; impacts of variable retention harvest on upland slope stability; impacts to soil productivity and disturbance; impacts to special status botanical species from soil disturbance and canopy cover changes; impacts to the spread and persistence of non-native invasive plants from changes in forest canopy cover, road management, and soil disturbance; impacts to fish, including Oregon Coast coho salmon critical habitat, Essential Fish Habitat, and BLM sensitive fish species from

road management, timber harvest, and fuels management; impacts to cultural resources; impacts to bald and golden eagles and their habitat; impacts to Franklin's bumblebees and their foraging or nesting habitat; impacts to carbon storage, greenhouse gas emissions, climate change, and the social cost of carbon; and impacts to Northwestern pond turtles and their habitat.

109. The issues excluded from detailed analysis relate to mandatory management directions adopted in the Northwestern RMP.

110. In an appendix to the EA, BLM briefly discussed the issues not evaluated in detail. In each case, the agency summarily concluded that there would be no significant effects, either individually or cumulatively, beyond those described in Northwestern RMP and the programmatic FEIS to which the Blue and Gold EA purportedly tiered.

111. BLM offered no substantive response to Plaintiffs' comments requesting site-specific analysis of the Blue and Gold Project's impacts on carbon storage, greenhouse gas emissions, and climate change, instead pointing to a cursory Appendix section that merely restates broad-scale analysis from the programmatic FEIS for the 2016 RMP.

112. BLM similarly offered no substantive response to Plaintiffs' comments regarding the Project's failure to adhere to the federal policy to conserve mature and old-growth forests outlined in EO 14072.

113. BLM offered no response to Plaintiffs' comments regarding the Project's inconsistency with the agency's own newly promulgated Public Lands Rule, including the Rule's focus on protecting intact landscapes.

114. Neither the programmatic FEIS nor the Blue and Gold Project EA analyzes the Blue and Gold Project's site-specific impacts on Bureau Sensitive Species, mature and old-growth forests, carbon storage, greenhouse gas emissions, or climate change.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-24

**Northern Spotted Owl and the Blue and Gold Harvest Plan**

115. The northern spotted owl (*Strix occidentalis caurina*) ("NSO") is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The NSO occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including the Blue and Gold Project Area.

116. Spotted owls rely on older, mature, and complex forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal.

117. Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the FWS listed the NSO as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

118. The FWS designated critical habitat for the species in 1992, and revised the designations in 2008, 2012, and 2021.

119. The 2012 critical habitat rule states that "primary constituent elements" of NSO critical nesting and roosting habitat typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (*e.g.*, large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly. 77 Fed. Reg. 71,905 (Dec. 4, 2012).

120. The Blue and Gold Project Area is within the range of the northern spotted owl.

121. The Project's logging units fall within 39 owl sites, including at least two that are presently occupied, and many others that are currently used by spotted owls.

122. BLM and FWS also concluded the Blue and Gold Project's logging and road construction is "likely to adversely affect" spotted owl habitat and spotted owl nest sites.

123. However, BLM assumed that its proposed commercial thinning of existing owl nesting and roosting habitat would not downgrade its function and would maintain canopy cover at 60%.

124. Plaintiffs highlighted in their comments that the existing canopy cover in some of these mature and old-growth areas is already between 60 to 80%. It is an impossibility for BLM to commercially thin as heavily as it proposes and maintain 60% canopy cover. Previous BLM analysis of commercial thinning prescriptions that would reduce density to between 20 and 30% residual density index resulted in canopy cover levels far below 40%. The amount of timber volume BLM estimates will come from these old-growth units is astronomically high. BLM's assumption that it will log to 25% residual density index and maintain 60% canopy cover is controversial, fundamentally flawed, and unrealistic.

125. BLM's spotted owl analysis assumes that all the proposed commercial thinning will "modify" spotted owl habitat, but not downgrade its function. The Biological Assessment and Biological Opinion for the Blue and Gold Project concede that the proposed thinning will reduce the function of this habitat in several different respects by eliminating multi-canopy layers, by eliminating snags, downed woody debris, hardwoods, and shrubs, by reducing the prey base, and by increasing barred owl threats.

126. BLM's spotted owl analysis assumes that yarding corridors and road construction and renovation areas will "modify" the forests in these areas but maintain function. Yarding corridors and road construction/renovation cover hundreds of acres. Yarding corridors and road construction/renovation necessitate total tree removal in these areas.

127. The Project logging units also fall within designated critical habitat for the northern spotted owl.

128. These units also largely consist of Recovery Action 32 habitat ("RA32"); such areas contain the highest quality habitat for northern spotted owls. The Recovery Plan for the northern spotted owl calls for the protection of all existing RA 32 habitat. The proposed logging in Blue and Gold will remove and downgrade RA32 habitat.

129. BLM internally identified the majority of the areas to be logged in the Blue and Gold Project as RA32 habitat. These areas were not depicted as RA32 habitat in the Blue and Gold Project documents. Blue and Gold Project documents represent that only 95 acres of RA32 will be logged.

130. FWS identified in its BiOp that spotted owl survey coverage within the analysis area was not as comprehensive as BLM had assumed. This compelled another round of surveys this past year.

131. The 2024 surveys were rushed, inadequate, and did not cover the areas they purport to cover. These surveys were inadequate to determine whether spotted owls are present in the areas to be logged.

**Marbled Murrelet and the Blue and Gold Harvest Plan**

132. Marbled murrelets (*Brachyramphus marmoratus*) are small sea birds found along the northwest coast of North America.

133. FWS listed the marbled murrelet as a threatened species under the Endangered Species Act in California, Oregon and Washington on October 1, 1992. 57 Fed. Reg. 45,328 (Oct. 1, 1992) (codified at 50 C.F.R. § 17.11(h)); see also see also *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1062 (9th Cir. 1996) (loss of nesting habitat has been "[t]he most significant factor in [murrelets'] decline").

134. FWS originally designated critical habitat in Washington, Oregon and California on May 24, 1996, reaffirming and designating habitat on August 4, 2016. 81 Fed. Reg. 51,348 (August 4, 2016).

135. In 2010, FWS reaffirmed that murrelets "continue to be subject to a broad range of threats, such as nesting habitat loss, habitat fragmentation, and predation."

136. In July of 2021, the marbled murrelet was reclassified as endangered under the Oregon Endangered Species Act.

137. Murrelets spend most of their lives at sea but fly inland up to 50 miles during the spring and summer months to nest in mature and old-growth forests.

138. Unlike other birds, murrelets do not build nests in trees but instead lay their eggs on thick, flat branches that are naturally covered with moss. These are known as "platforms." The presence of these platforms is the most important characteristic of their nesting habitat.

139. Generally, only very large, old trees contain suitable platforms. Therefore, murrelet nesting sites are closely associated with mature and old-growth forests.

140. During the nesting season, marbled murrelet feathers are cryptically colored in browns and whites to blend into the forest environment, making them difficult to spot while inland. The female lays one egg and the male and female incubate the egg in shifts while the other bird feeds in the ocean. The egg is usually incubated for 30 days, and fledging takes 28

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-28

days. Typically, the male and female switch incubation shifts at dawn or dusk to avoid detection by predators.

141. Murrelets have high "site fidelity," meaning they return again and again to nest in the same forest stand and often the same tree. This fidelity is consistent throughout the species' range.

142. To successfully reproduce, murrelets need large, unfragmented blocks of mature forest habitat. These large blocks of forest protect murrelet nest sites from weather, windthrow, microclimate effects, and, most importantly, predators. Marbled murrelet nest sites are negatively impacted due to logging that creates these "edge effects."

143. The Blue and Gold Project Area is within the range of the marbled murrelet. The Blue and Gold Project area is located between 35-50 miles from the ocean and is thus within "Zone 2" for murrelet management direction purposes.

144. BLM and FWS both concluded that the Blue and Gold Project's logging and road construction is "likely to adversely affect" marbled murrelets and their habitat. The Project will remove 1,730 acres of marbled murrelet nesting habitat through commercial thinning, variable retention regeneration harvest, and yarding wedges. This will adversely affect murrelet critical habitat and compromise the role of critical habitat at the action area scale. The logging prescriptions, including the commercial thinning prescriptions, do not require the protection of old-growth potential nest trees or the horizontal and vertical cover adjacent to potential nest trees.

145. There are six known occupied sites within the marbled murrelet analysis area and many areas to be logged remain unsurveyed. There are 1,174 acres of BLM-managed land within 300 feet of regeneration logging units, road construction and renovation, and yarding wedges or

within 150-foot buffer of commercial thinning adjacent that have not been surveyed for murrelets. This includes acres within reserve allocations. Proposed logging activities may adversely affect nesting murrelets in adjacent stands, including reserved allocations.

146. The Project authorizes up to 726 acres of yarding within the riparian reserves. Yarding corridors are 20-foot-wide strips where all trees are logged and removed. Trees removed in 374 acres of these Riparian Reserves that will be modified by proposed BLM activities have not been surveyed for marbled murrelets.

147. The Project logging units also fall within designated critical habitat for the marbled murrelet. 1,787 acres of designated critical habitat, which is also nesting habitat, is proposed for removal through commercial thinning, regeneration harvest, and yarding wedges. The proposed logging will adversely affect the conservation role of critical habitat at the larger sub-unit scale because it will remove 24 percent of the functioning nesting habitat. The proposed logging will compromise the role of the critical habitat through increased habitat fragmentation and reduced population support.

148. The proposed logging does not include restrictions on logging murrelet nesting structure. Murrelet nesting structure is generally old-growth trees with suitable nesting platforms.

149. During consultation for the Blue and Gold Project, FWS identified that it anticipates 13 murrelet chicks/eggs will be incidentally taken as a result of this proposed action.

**Oregon Coast Coho Salmon, Watersheds, and the Blue and Gold Harvest Plan**

150. Oregon Coast coho salmon (*Oncorhynchus kisutch*) are anadromous (ocean-running, freshwater-returning) fish that spawn and rear in rivers, streams, and lakes along Oregon's coastline, from the Necanicum River near Seaside on the north to the Sixes River near Port Orford on the south.

151. NMFS first listed Oregon Coast coho salmon as a threatened species under the ESA in 1998. NMFS relisted the species in 2008 and reaffirmed the listing in 2011. 73 Fed. Reg. 7815 (February 11, 2008).

152. Rivers in the Oregon Coast evolutionarily significant unit ("ESU") flow from the mountains of the Coast Range, with the exception of the Umpqua River, which flows down from the Cascade Range and on through the Coast Range. Most of these rivers transition to estuaries upon approaching the Pacific Ocean.

153. The anadromous life cycle for coho salmon begins in their home stream, normally a small tributary with moderate to low gradient stream reaches. The juvenile fish typically spend one summer and a winter rearing in cool, slow-moving stream reaches—backwater pools, beaver ponds, and side channels—before heading downstream to the ocean as smolts in the spring, typically from late April until early June.

154. After spending two summers in the ocean, coho salmon return to their natal tributaries between September to November as three-year-old fish.

155. On February 11, 2008, NMFS designated critical habitat for the Oregon Coast coho salmon ESU. 73 Fed. Reg. 7,816 (Feb. 11, 2008). This designation remains in effect.

156. The Recovery Plan for Oregon Coast coho salmon identifies that land use activities have contributed to increased water temperatures in coastal streams by removing riparian vegetation, disconnecting streams from floodplains, and reducing streamflow.

157. Freshwater quality and quantity in Cascade and Coast Range streams and rivers are essential for the recovery and viability of Oregon Coast coho salmon populations. Fish species, particularly these salmon, are vulnerable to changes in water temperature, reduced in-stream and riparian structure and complexity, and fluctuations and changes in water quantity. Both changes

to peak and low flow can impact salmon species, as outgoing smolts depend on higher late-spring flows to travel downstream to the ocean (peak flow impacts) and adult returning salmon depend on consistent late-summer/fall stability in flow to access their natal streams (low flow impacts).

158. The Blue and Gold Project Area is within the range of the Oregon Coast coho salmon, which are known to inhabit watersheds and subwatersheds in the Project Area.

159. BLM does not anticipate adverse impacts to this species. However, it plans to utilize 738 acres of yarding in Riparian Reserves on which these species depend on and that the RMP designated for the recovery and conservation of listed/special status fish species, including Oregon Coast coho salmon.

160. Plaintiffs and BLM independently identified and cited reputable literature addressing the interplay of logging and flow within watersheds in Oregon forests, including the 2016 Perry Jones study titled, "Summer streamflow deficits from regenerating Douglas-fir forest in the Pacific Northwest, USA." This study found the widespread conversion of mature forests into plantations caused low summer flows. Summer streamflow deficits in headwater basins may be particularly detrimental to anadromous fish, including steelhead and salmon, by limiting habitat, exacerbating stream temperature warming, and potentially causing large-scale die-offs.

161. Heavy logging within forested watersheds affects flows (peak and low) allowing water to run quickly through them with little structure to slow entrance into waterways, often resulting in higher peak flows and lower late summer flows, both of which can negatively impact aquatic species.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-32

162. BLM's proposed vegetation management will affect summer flow surpluses and summer flow deficits by changing interception and evapotranspiration. These effects generally scale linearly with the amount of area logged.

163. BLM concluded that the proposed vegetation management would not significantly affect water quantity or flow or the listed fish that depend on it.

164. BLM did not directly calculate or estimate stream discharge, or the loss or gain in summer streamflow volume and flow connectivity, and based on the planning documents, it does not plan to.

165. Despite 738 acres of proposed riparian yarding and heavy logging in watersheds in and around critical habitat for Oregon Coast coho salmon, Essential Fish Habitat, and BLM sensitive fish species were not analyzed in detail.

166. Heavy logging in and around watersheds as well as directly in Riparian Reserves results in changes in water temperature, reduced in-stream and riparian structure and complexity, decreased shade, fluctuations and changes in water quantity, increases in sedimentation, and decreased water quality.

/

**Special Status Species and The Blue and Gold Harvest Plan**

167. BLM identified, but dismissed as non-significant, several issues related to other "special status" wildlife species and their habitat.

168. Special status species are species for which population viability is a concern, as evidenced by significant current or predicted downward trends in population numbers or density and habitat capability that would reduce a species' existing distribution. Pursuant to BLM policy, the agency must use all methods and procedures necessary to improve the condition of Special

Status Species and their habitats to a point where their Special Status recognition is no longer warranted. BLM actions must not contribute to the need for ESA-listing of these species.

169. BLM outlined in a table a list of sensitive species "known to occur within the Analysis Area" but did not survey the area or otherwise attempt to analyze or describe site-specific impacts to these species. Instead, the agency purported to tier to the RMP and outlined a list of generic mitigation actions (project design features or "PDFs") that it could possibly employ in the event they do encounter sensitive species in implementing the Blue and Gold Harvest Plan.

**Wildfire and the Blue and Gold Harvest Plan**

170. BLM's wildfire risk analysis concludes that heavily thinning existing mature forest will convert fire hazard in these areas from "mixed" to "low."

171. However, BLM estimates in many areas with its heaviest prescriptions, variable retention harvest units here, fire hazard would remain high for decades post-treatment.

172. For example, under Alternative 6, after 20-40 years the VRH acres, 24 percent of the treatment acres, would change to structural stage stand establishment, then young high density, both described as high hazard in the RMP. BLM identified it would take up to 80 years before fire hazards in VRH units would transition back to low.

173. Plaintiffs presented scientific literature in their comments on the Blue and Gold EA demonstrating that commercial thinning can actually increase fire risks by increasing sunlight exposure which dries out undergrowth vegetation, by dramatically increasing highly flammable understory growth response, and by increasing wind speed and corresponding rate of wildfire spread and intensity. It also removes old-growth fire-resistant forest structures that have been consistently demonstrated to stall or slow the spread of wildfire.

174. BLM addressed none of this literature or these points in its planning documents.

175. Over 90% of the project's logging units are within the Wildlands Development Area (WDA), an area that is delineated close to homes. The proposed variable retention regeneration harvest will drastically increase fire hazard near communities adjacent to the project area.

## CLAIMS FOR RELIEF

### Claim 1: Violations of the Federal Land Policy and Management Act

### Count 1: The EA and FONSI Authorize Activities Inconsistent with RMP Direction Governing Old-Growth Forest Management

176. Cascadia realleges and incorporates by reference all preceding paragraphs.

177. Pursuant to FLPMA, BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

178. The RMP prohibits the removal of trees established before 1850 exceeding 40" diameter at breast height that are identified by BLM.

179. Blue and Gold Project logging units within T25S-R06W-sections 27,28,29, and 33 largely consist of forests that were established before 1850. These areas are dominated by trees established before 1850 exceeding 40" diameter at breast height.

180. BLM staff internally identified this old-growth structure, but these "identifications" were not discussed or included in the Blue and Gold EA and FONSI.

181. BLM inaccurately depicted these forest areas as a maximum of 130 or 140 years old to facilitate their commercial logging in the Blue and Gold EA and FONSI.

182. BLM has failed to identify trees in units authorized for logging that were established before 1850 and exceed 40" diameter at breast height in the Blue and Gold EA and FONSI. BLM's failure to identify these trees will result in their commercial logging in violation of the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-35

RMP. BLM's failure to identify these trees resulted in a failure to demonstrate that the Blue and Gold EA, FONSI, and associated Decision Records are consistent with the RMP.

183. The implementation of BLM's authorized logging prescriptions in these structurally complex forest units will necessarily result in extensive logging of the old-growth structure which dominates these areas.

184. The mature, structurally complex units targeted for commercial logging will involve the removal of trees established before 1850 exceeding 40" diameter at breast height in violation of BLM's RMP.

185. The Blue and Gold EA and FONSI analyzed and selected prescriptions that will result in logging and removal of trees established before 1850 exceeding 40" dbh.

186. BLM has failed to ensure that the Blue and Gold Project is consistent with the RMP's management directions regarding old trees and old-growth, thus violating FLPMA.

/

**Count 2: The EA, DR, and FONSI Are Inconsistent with RMP Direction Regarding Northern Spotted Owls, Marbled Murrelet, and Their Habitat**

187. Cascadia realleges and incorporates by reference all preceding paragraphs.

188. Pursuant to FLPMA, BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

189. The RMP prohibits "timber sales that would cause the incidental take of northern spotted owl territorial pairs or resident singles from timber harvest." "As part of the process to determine whether a planned timber harvest would result in take of northern spotted owls, the BLM will establish whether the northern spotted owl is actually present in the area that will be affected by the timber harvest using the best available science at that time."

190. BLM has failed to conduct adequate surveys for the northern spotted owl. BLM's survey effort did not establish whether the northern spotted owl is actually present in areas to be logged. These surveys did not utilize the best available science to detect owls to avoid take and comply with RMP management direction.

191. The survey efforts the BLM did undertake underrepresented the locations and acreages of forest within the Project area that are occupied and used by northern spotted owls. Further, BLM's interpretation of the survey data underreports the number of occupied activity centers.

192. BLM has failed to survey and/or has inadequately surveyed for northern spotted owls in the Blue and Gold Project area.

193. BLM has failed to properly apply the murrelet management directions within the RMP. BLM has failed to survey for the marbled murrelet in areas where its proposed logging and logging related activities will modify murrelet nesting habitat, in violation of the RMP and FLPMA.

194. BLM's conclusion that the project will not result in unauthorized take of northern spotted owls must be based on adequate spotted owl surveys. Such surveys did not occur, in violation of the RMP and FLPMA.

## Claim 2: Violations of the National Environmental Policy Act

## Count 1: BLM Violated NEPA by Failing to Prepare an EIS for the Blue and Gold Project

195. Cascadia realleges and incorporates by reference all preceding paragraphs.

196. Federal agencies are required to prepare an EIS when "substantial questions" are raised as to whether a major federal action "may" cause significant degradation of some human environmental factor. 42 U.S.C. § 4332(C).

197. An agency's decision not to prepare an EIS must be fully informed, adequately considered, and supported by a convincing statement of reasons why the action's effects will not be significant.

198. In deciding whether an action may have a significant impact, the agency must consider the context and intensity of the proposed project. 40 C.F.R. § 1508.27. NEPA regulations relevant to this project (in force at the time of project scoping) identify ten considerations for the agency to consider in evaluating the significance of a proposed project.[2]

199. Specifically, in assessing the intensity of a project BLM must consider unique characteristics/ecological areas, the degree to which the proposed action affects public health or safety, the degree to which effects are likely to be highly controversial, the degree to which possible effects are highly uncertain; the degree to which ESA-listed species or critical habitat will be adversely affected; whether potentially insignificant individual effects are potentially significant at a cumulative level; and whether an action threatens a violation of an environmental protection law, among others. *See* 40 C.F.R § 1508.27(b) (1978).

200. The significance of one individual factor, or significance associated with consideration of multiple intensity factors cumulatively, requires preparation of an EIS.

201. The Blue and Gold Project implicates numerous intensity factors that individually and cumulatively require the preparation of an EIS. BLM therefore acted arbitrarily and capriciously in issuing a FONSI and failing to prepare an EIS.

**This Project Affects Unique and Ecologically Critical Areas.**

---

[2] Noting, there has been regulatory changes here. However, BLM correctly identifies that this EA was started prior to July 1, 2024, and therefore the old NEPA regulations apply.

202. The Blue and Gold Project will affect areas with unique characteristics, including, but not limited to, critical habitat for ESA-listed species, unique habitat for numerous special-status wildlife species, and Riparian Reserves.

203. Logging, especially ground-based logging and the proposed 738 acres of riparian yarding will increase sedimentation into Yellow Creek and impact water quality and quantity (peak and low flow) in watersheds within the project area.

204. Furthermore, prior to adopting the 2016 RMP, BLM managed a significant portion of the overall Project Area, including the most intact stretch of old forest stands as LSRs—the land use allocation specifically meant to protect and develop late-successional forest characteristics needed by NSO and marbled murrelets.

205. The units slated for logging under the Blue and Gold Project are also among the last remaining intact old and mature forests functioning at an ecosystem level in the Oregon Coast Range. These last few ancient forest stands remaining on BLM land are unique.

206. Multiple square miles of continuous blocks of mature and old-growth forest high up on Coast Range ridgelines in the project area provide unique refugia for marbled murrelets who travel over 35 miles up the Umpqua River from the Pacific Ocean daily to nest and then feed their young.

207. It is unlikely a more robust population of marbled murrelet exists this far inland. It is also unlikely that a more robust and functional old-growth forest habitat exists for these listed seabirds in the entirety of Zone 2 (the habitat range identified by FWS as 35 to 50 miles from the coast) in Western Oregon.

**This Action Affects Public Health or Safety.**

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-39

208. BLM's action risks public safety by increasing wildfire hazard (severity) in the Project Area.

209. BLM's logging will result in stands far less resilient to wildfire. In many areas, wildfire hazard will be converted to high and persist at high hazard for decades.

210. BLM acknowledges smoke is a public safety consideration associated with this project; however, the agency misses the more obvious and concerning component: the fire itself.

211. Converting fire-resistant mature forest stands to young plantations with high fire risk and increased severity for decades near homes and communities in Douglas County (within the WDA) weighs sharply in favor of preparing an EIS.

**The Effects of This Action Are Highly Uncertain and Controversial.**

212. A high degree of uncertainty and controversy exists regarding the effects of the Blue and Gold Project.

213. In light of the doubts cast on the sufficiency of surveys for listed species as well as BLM's stand age classifications and its inventory of mature and old growth forest and RA32 habitat in the Project Area, the environmental consequences of this Project are highly uncertain in regard to a whole host of issues whose analysis is predicated on accurate age and habitat classifications as well as structural and ecological conditions in the Project Area.

214. BLM's failure to take the requisite hard look at impacts to Special Status Species or their unique habitats renders the impacts to these species and their habitats uncertain. This includes, but is not limited to, impacts to Franklin's Bumblebee, steelhead, bald and golden eagles, and their unique habitats present within proposed logging units. BLM in most cases has not surveyed for or field-verified reports of special status species or their unique habitats within proposed logging units. This creates uncertainty around impacts and their severity.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF-40

215. BLM's lack of data, admitted lack of applicable analogs in the available literature or agency experience, and commitment to no further study or monitoring renders the efficacy and validity of BLM's scientific assumptions and conclusions regarding peak and low flow and impacts on watersheds in the project area and the fish species that inhabit them highly uncertain.

216. BLM's failure to take the requisite hard look at carbon storage and climate-related concerns renders impacts highly uncertain.

217. Logging in mature and old forest stands like those found in the Blue and Gold Project Area is scientifically controversial. There is no ecological rationale to support commercial logging as authorized here. Rather, the aggressive logging proposed would decrease fire and climate resilience, increase fire hazards, and remove vitally needed habitat for ESA-listed species.

218. Cascadia identified literature undercutting BLM's fire analysis and assumptions that its proposed commercial thinning of existing old-growth forests would result in increased fire resilience. Commercial thinning of existing mature and old-growth forests decreases fire resilience. Such logging removes fire-resilient trees, increases wind speeds in the logged area, and increases flammable undergrowth response. Studies from Southern Oregon have found that the heavy commercial thinning of older forests corresponded with higher levels of fire severity. BLM failed to grapple with this contradicting scientific evidence provided in public comments.

219. The efficacy and validity of BLM's scientific assumptions and conclusions regarding wildfire resilience is highly controversial.

220. BLM's silvicultural assumptions and conclusions are highly controversial and uncertain. BLM's conclusion that it can simultaneously remove 75 percent of stand density while

maintaining 60 percent canopy cover in complex forests is scientifically inconsistent with literature and common sense.

**This Action Adversely Affects ESA-Listed Species and Their Habitat**

221. The degree to which ESA-listed species and their critical habitat will be adversely affected by the Project weighs in favor of significance.

222. This Project will adversely affect listed species by removing and/or downgrading thousands of acres of spotted owl and marbled murrelet habitat and negatively affecting known sites for both species.

223. The Project will remove 1,730 acres of marbled murrelet nesting habitat through commercial thinning, variable retention regeneration harvest, and yarding wedges. This project will adversely affect 1,787 acres of murrelet nesting habitat that is designated critical habitat through commercial thinning, regeneration harvest, and yarding wedges. These negative impacts will compromise the role of critical habitat at the Action Area scale due to the increase in habitat fragmentation and reduction in population support. This logging will likely result in the take of 13 murrelet chicks.

224. FWS noted that the proposed Project is expected to affect approximately 3,336 acres of spotted owl habitat. In other words, every single proposed acre of "treatment" will affect owl habitat. Owl habitat in this region is generally limited to stands providing very large trees with cavities or deformities.

225. This action will log 960 acres of spotted owl critical habitat, resulting in the removal of 723 acres of spotted owl habitat, including 110 acres of nesting, roosting, and foraging habitat (NRF).

226. FWS concluded that the proposed action will remove 95 acres and modify 1,453 acres of older and structurally complex conifer forests through all activities proposed within the analysis area of the Action Area.

227. Surveys for both northern spotted owls and marbled murrelets were inadequate.

228. Spotted owl surveys were fraught with equipment and technical difficulties, staffing challenges, terrain and access issues, design flaws, and protocol and instruction problems rendering them highly unlikely to result in detections. These surveys were inadequate to determine whether spotted owls inhabit the areas to be logged. Without adequate data on occupancy, BLM will almost certainly impermissibly take northern spotted owls

229. Surveys for murrelets did not occur as required by the RMP.

230. Without required murrelet surveys, BLM is impermissibly logging potentially occupied marbled murrelet habitat. The Biological Opinion for the project states that logging in newly discovered occupied murrelet sites is not authorized.

231. This Project, impacting stream flow, water quality, and removing 738 acres of RR-designated land, also poses serious and largely unanalyzed risks for Oregon Coast coho salmon in the Project Area who are also likely to be adversely affected by the implementation of the Blue and Gold Harvest Plan.

**This Project Threatens to Violate Law**

232. BLM has not and cannot show it can implement the Project without running afoul of numerous substantive provisions and guidelines of the RMP, such that it can demonstrate its action will not violate FLPMA.

233. Facing threatened, if not actual, violations of FLPMA, the ESA, and other laws enacted for the protection of the environment, BLM was required to complete an EIS—a more

searching and rigorous analysis of this Project's effects on the environment and its compliance with federal environmental law.

234. BLM's decision to authorize the Blue and Gold Project without first preparing an EIS violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, and not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2: BLM Failed to Take a Hard Look and Otherwise Consider Significant Aspects of the Problem.**

235. Cascadia realleges and incorporates by reference all preceding paragraphs.

236. Federal agencies are required to disclose and analyze the direct, indirect, and cumulative effects of proposed actions on the environment. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c), 1508.27(b)(7). The impacts analysis in an EA must be "site-specific" because in order to determine the "significance" of an action, the agency must consider impacts on the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a).

237. "An agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

238. NEPA allows agencies to tier their analyses to a previous NEPA document (generally, a programmatic assessment) to eliminate repetitive discussions and concentrate on the issues specific to the proposed action, 40 C.F.R. §§ 1508.20, 1508.28. Tiering refers to coverage of "general matters" in the programmatic NEPA document with a subsequent narrower NEPA document incorporating by reference the "general discussions." 40 C.F.R. § 1508.28. However,

either the programmatic NEPA document or the NEPA document tiering to the programmatic

analysis must contain site-specific analysis of pertinent issues. *Id.*

239. Here, BLM failed to take a hard look at the effects of the action, including but not

limited to: carbon storage, greenhouse gas emissions and climate change, logging of old trees

and forests, ESA-listed and special status species and their habitat, wildfire, and watershed

impacts.

240. BLM's programmatic FEIS contains no site-specific analysis of special status

wildlife species and their habitat, watershed impacts, or carbon storage, greenhouse gas

emissions, and climate change-related concerns within the Blue and Gold Project Area.

241. The programmatic FEIS also did not and could not take into account new

information and policy direction that has arisen since 2016, including relevant executive orders

directing federal agencies like BLM to accurately calculate and disclose the social cost of

greenhouse gas emissions associated with agency actions and to conserve mature and old-growth

forests on federal lands, and the agency's own new Public Lands Rule emphasizing the

protection of intact landscapes.

242. BLM failed to take a hard look at how the Blue and Gold Project complied with

these relevant sources of policy direction.

243. For example, despite the considerable concentration of mature and old-growth forest

in the Project Area, BLM failed to consider, detail, quantify, or qualify the certain loss of climate

change-mitigating and carbon-storing trees and forest stands in the EA.

244. Moreover, for issues BLM did analyze, such as owls, murrelet, and their habitat,

peak and low flow, and fire hazard the "facts found, and the choice made" share no rational

connection and the agency otherwise failed to articulate a convincing statement of reasons for how this project would not be significant.

245. BLM's failure to take the requisite hard look at the Project's direct, indirect, and cumulative effects, and failure to make a reasoned determination of non-significance violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

<u>**REQUEST FOR RELIEF**</u>

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A. Declare BLM's issuance of the Blue and Gold Environmental Assessment, Finding of No Significant Impact, and associated Decision Records to be arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

B. Declare the Blue and Gold Harvest Plan Environmental Assessment, Finding of No Significant Impact and associated Decision Records violate FLPMA and its implementing regulations because they are inconsistent with the applicable RMP;

C. Declare that BLM violated the National Environmental Policy Act and its implementing regulations by approving the Blue and Gold Project without preparing an EIS and without taking the requisite hard look at environmental impacts;

D. Vacate and set aside the EA, FONSI, and DR for the Blue and Gold Project, and order BLM to withdraw any decisions or contracts made pursuant to any associated Decision Records until such time as BLM demonstrates that it has complied with the law;

E.  Enjoin BLM and its contractors, assigns, and other agents from proceeding with implementing the Blue and Gold Project until such time as BLM demonstrates that it has complied with the law;

F.  Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be subsequently requested by Plaintiffs;

G.  Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

H.  Grant such further relief as the Court deems just, proper, and equitable.

Respectfully submitted and dated this 17th day of October 2024.

*/s/* Meriel Darzen_____

Meriel Darzen (OSB # 113645)

*/s/* Nick Cady_____

Nick Cady (OSB # 113463)

*/s/* Peter Jensen_____

Peter Jensen (OSB #235260)

*/s/* John Persell_____

John Persell (OSB # 084400)

*Attorneys for Plaintiffs*