**WILLIAM M. NARUS, CAB #243633**
Acting United States Attorney
District of Oregon
**SEAN E. MARTIN, OSB #054338**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204
sean.martin@usdoj.gov
Telephone:  (503) 727-1000
         Attorneys for Defendant


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON


| | |
|---|---|
| **CASCADIA WILDLANDS; OREGON WILD; UMPQUA WATERSHEDS,** | Case No. 6:24-cv-01641-MTK |
| Plaintiffs, | |
| v. | **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT/IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **U.S. BUREAU OF LAND MANAGEMENT**, | |
| Defendant, | |
| and | |
| **AMERICAN FOREST RESOURCE COUNCIL** and **ASSOCIATION OF O&C COUNTIES**, | |
| Defendant-Intervenors. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ............................... viii

CROSS-MOTION .............................................................................1

MEMORANDUM ...............................................................................1

FACTUAL BACKGROUND ...................................................................1

    A.    BLM's 2016 Resource Management Plan ................................1

    B.    The Blue and Gold Harvest Plan .........................................4

PROCEDURAL HISTORY ...................................................................7

STATUTORY AND REGULATORY BACKGROUND ...................................8

    A.    The O&C Act ....................................................................8

    B.    The Federal Land Policy and Management Act ("FLPMA") ..............9

    C.    The National Environmental Policy Act ("NEPA") ......................... 10

STANDARD FOR JUDICIAL REVIEW ................................................. 12

ARGUMENT .................................................................................. 14

    I.    Blue and Gold is consistent with the 2016 RMP's direction
        for individual-tree retention and complies with FLPMA ................. 14

        A.    BLM complied with FLPMA ....................................... 14

        B.    None of Plaintiffs' summary judgment arguments show
            that Blue and Gold is inconsistent with the 2016 RMP ............. 17

            1.  Plaintiffs' second-guessing of the 2016 RMP is off limits ............ 17

            2.  Plaintiffs mischaracterize the 2016 RMP .................................... 17

i

3. The Reeder and Reid comment letters do not show any inconsistency with the 2016 RMP................................................ 19

4. Plaintiffs' ESA-based argument does not show a FLPMA violation .................................................................................. 20

5. Plaintiffs' FLPMA argument relies heavily on inappropriate extra-record evidence; in any event, the evidence shows no inconsistency with the 2016 RMP................................................ 21

6. Plaintiffs' FLPMA argument also relies heavily on post-decisional declarations that are off limits in APA merits review...................................................................................... 23

II.   BLM undertook the requisite NEPA hard look at the effects of Blue and Gold .................................................................................. 25

A.   BLM's EA provided sufficient information to allow the public to weigh in regarding the project's effects on stands and trees ........................................................................................ 26

B.   BLM adequately addressed the effects of timber harvest on carbon storage and climate change......................................... 28

III.  BLM rationally found that an EIS was not needed for Blue and Gold.................................................................................... 33

A.   BLM rationally predicted that the potential effects of the project would not be highly uncertain to the extent that required an EIS............................................................................ 34

B.   BLM rationally predicted that Blue and Gold would not have effects on ESA-listed species requiring an EIS.................. 37

1. The intensity of effects on NSOs did not require an EIS ........... 38

2. The intensity of effects on murrelets did not require an EIS...... 40

C.   BLM rationally predicted that the project would not violate FLPMA ............................................................................. 42

ii

D.    BLM rationally found that the geographic characteristics
of the Blue and Gold area did not require an EIS ....................... 42

E.    BLM rationally found that an EIS was not required based
on adverse effects to public health and safety ........................... 46

CONCLUSION AND REMEDY ...................................................................... 49

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023) ......... 9

*Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794 (9th Cir. 1980) ......................... 24

*Bark v. Northrop*, 607 Fed. App'x 652 (9th Cir. April 15, 2015) .................... 38

*Bark v. Northrop*, No. 3:13-cv-00828-AA, 2016 WL 1181672
     (D. Or. March 25, 2016) ................................................................. 39

*Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438
     (9th Cir. 2024) ............................................................................... 20

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
     419 U.S. 281 (1974) ...................................................................... 13

*Cal. by and through Becerra v. Azar*, 950 F.3d 1067
     (9th Cir. 2020) .......................................................................... 20, 36

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271
     (D. Or. 2013) ................................................................................. 41

*Churchill Cty. v. Norton*, 276 F.3d 1060 (9th Cir. 2001) ............................. 26

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ......................... 12

*Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189
     (E.D. Cal. 2017) ............................................................................ 38

*Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701
     (9th Cir. 2009) .......................................................................... 35-36

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
     450 F.3d 930 (9th Cir. 2006) ......................................................... 25

*Ctr. for Biological Diversity v. U.S. Forest Serv., ("Black Ram")*,
     687 F. Supp. 3d 1053 (D. Mont. 2023) ........................................... 30

*Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*,
61 F.4th 633 (9th Cir. 2023) ........................................................................ 13

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850
(9th Cir. 2022) ............................................................................................ 12

*Env't Prot. Info. Ctr. v. Blackwell*, 2005 WL 8176926
(E.D. Cal. May 5, 2005) .................................................................... 45, 45-46

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005 (9th Cir. 2006) ....... 39

*Friends of the Earth v. Hintz*, 800 F.2d 822 (9th Cir. 1986) ........................... 13

*Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010) ......................................... 32

*Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174
(9th Cir. 1990) .......................................................................................... 8, 35

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ................. 37

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 2021 WL 5356969
(D. Or. Aug. 24, 2021) .................................................................. 16-17, 30, 35

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 2024 WL 2941529
(D. Or. May 24, 2024) ................................................................................. 48

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc) ................. 13

*Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025) ....................... 10

*Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................................................................................... 13

*Native Ecosystems Council v. Weldon*, 697 F.3d 1043 (9th Cir. 2012) ...... 27, 28

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372
(9th Cir. 1998) ............................................................................................ 26

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................... 9, 10

v

*Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766 (9th Cir. 1985) .................... 13-14

*Pres. Coal., Inc. v. Pierce*, 667 F.2d 851 (9th Cir. 1982) ................................. 44

*Rivers v. BLM*, 6:16-cv-01598-JR, 2018 WL 6735090
    (D. Or. Oct. 12, 2018)................................................................... 4, 17

*Rivers v. BLM*, 815 Fed. App'x 107 (9th Cir. May 15, 2020) ...................... 4, 17

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............... 10

*Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346
    (9th Cir. 1994)............................................................................. 34, 45

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
    605 U.S. ____,
2025 WL 1520964 (May 29, 2025).....................................................
10-11, 12, 26, 31-32, 32, 33, 34, 37-38, 41, 45, 46, 48, 49

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) .................................................... 24-25

*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113
    (9th Cir. 2012)....................................................................... 12, 13, 24

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994)............. 49

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)................................. 49-50

*Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 WL 975179
    (D. Or. March 31, 2025)........................................... 3, 11, 30, 30-31, 35

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A) ............................................................................. 12

28 U.S.C. § 2401(a) .............................................................................. 17

42 U.S.C. § 4332(c)............................................................................... 33

43 U.S.C. § 1701 note............................................................................. 9

43 U.S.C. § 1732(a) ................................................................ 9, 10

43 U.S.C. § 2601 .................................................................... 2, 8

## FEDERAL REGULATIONS

40 C.F.R. § 1501.3(c)(2) ............................................................. 11

40 C.F.R. § 1501.3(d) ........................................................ 30, 47, 48-49

40 C.F.R. § 1501.3(d)(2)(i) ................................... 35, 37, 41, 42, 45, 46

40 C.F.R. § 1502.20 ................................................................. 11

40 C.F.R. § 1508.28 ................................................................. 11

43 C.F.R. § 1601.0-6 ................................................................ 11

43 C.F.R. § 1601.0-5(n) .......................................................... 9, 10

43 C.F.R. § 1610.5-3(a) ............................................................. 10

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| ASQ | Allowable Sale Quantity (defined at AR_08105) |
| BLM | U.S. Bureau of Land Management |
| DBH | Diameter at breast height |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish & Wildlife Service |
| HLB | Harvest Land Base |
| LSR | Late-Successional Reserve |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| RMP | Resource Management Plan |
| 2016 FEIS | 2016 Proposed Resource Management Plan and Final Environmental Impact Statement for the Resource Management Plans for Western Oregon (AR_08127-10240) |

2016 RMP                          2016 Northwest & Coastal Oregon
                                  Resource Management Plan (AR_07807-
                                  8126

**CROSS-MOTION**

Defendant U.S. Bureau of Land Management ("BLM") files this cross-motion for summary judgment against Plaintiffs' claims challenging BLM's authorization of the Blue and Gold Harvest Plan ("Blue and Gold project" or "Blue and Gold").  This cross-motion is supported by the following memorandum and BLM's certified administrative record (ECF 19-20).  The following memorandum also responds to Plaintiff's motion for summary judgment (ECF 27).  Pursuant to LR 7-1(a), the parties conferred but were not able to resolve the need for this cross-motion.

**MEMORANDUM**

## FACTUAL BACKGROUND

### A.    BLM's 2016 Resource Management Plan

The Blue and Gold project is located on BLM lands managed under the agency's 2016 Northwest & Coastal Oregon Resource Management Plan ("2016 RMP").  *See* AR_00352-54; AR_07807-8126 (RMP).

BLM adopted the 2016 RMP to update its management approach for western Oregon lands considering new science, policies, and technologies. AR_07809.  The 2016 RMP applies to 1.3 million acres of BLM-administered lands that span four different BLM districts.  *Id*.  Its adoption marked a four-year effort by BLM, in consultation with the U.S. Fish & Wildlife Service

("FWS") and other agencies, to again balance the agency's obligations—including "[c]ontribut[ing] to the conservation and recovery" of listed species while also "[p]rovid[ing] a sustained yield of timber." AR_07836.

The 2016 RMP allocated BLM-administered lands to five different land use allocations. AR_07859. About a fifth of these lands (274,045 acres) are allocated to the Harvest Land Base ("HLB"), where the primary management objective is managing forest stands "to achieve continual timber production." AR_07859, _07875. For HLB lands, the RMP specifically directs BLM to use commercial thinning and regeneration harvest. AR_07875-76. The 2016 RMP directs BLM to conduct timber harvest activities to contribute to its declared Allowable Sale Quantity ("ASQ"), as required by the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O & C Act", 43 U.S.C. § 2601). AR_07875, _07821-22. The RMP's declared ASQ for the Roseburg District is 32 million board feet per year. AR_07822.

BLM allocated most lands under the 2016 RMP to reserves. These lands include Late-Successional Reserve lands ("LSR," 576,714 acres), which are managed to maintain and promote habitat for species including the northern spotted owl ("NSO") and the marbled murrelet, both listed under the Endangered Species Act ("ESA"). AR_07859, _07880. By contrast, HLB lands are "not intended to be relied on for demographic support of spotted owls."

AR_10830.  The 2016 RMP's reserve lands also include 329,936 acres allocated as Riparian Reserves to protect ESA-listed fish and other species, and water quality.  AR_07859, _07884.

The underlying National Environmental Policy Act ("NEPA") analysis for the 2016 RMP is in BLM's 2016 Proposed Resource Management Plan and Final Environmental Impact Statement for the Resource Management Plans for Western Oregon ("2016 FEIS").  AR_08127-10240.

This Court has recognized the comprehensiveness of BLM's 2016 FEIS analysis regarding the effects of BLM land management activities on NSOs and the species' habitat.  BLM "specifically analyzed, in minute detail, how the [2016] RMP would be consistent with FWS's 2011 northern spotted owl Recovery Plan." *Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 WL 975179, *8 (D. Or. March 31, 2025).  *See*, *e.g.*, AR_09118-79, AR_09180-88 (NSO analysis in the 2016 FEIS).

The 2016 FEIS also surveyed scientific literature on murrelet biology and population trends in Oregon, and modeled how murrelet nesting habitat and population numbers would respond to RMP implementation.  *See* AR_09085-108.  The 2016 FEIS explained that RMP implementation would increase habitat distribution, nesting opportunities, and population size

throughout Oregon, although there would be some short-term adverse effects. *See id*.

BLM also consulted with FWS regarding the 2016 RMP's potential effects on NSOs and murrelets; FWS prepared a biological opinion under the ESA. AR_10241-1323.

This Court and the Ninth Circuit upheld the 2016 FEIS and 2016 RMP against a challenge from litigants including all three Plaintiffs in the instant case. *Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018), *aff'd*, 815 Fed. App'x 107, 110 (9th Cir. May 15, 2020). As this Court found, BLM in the 2016 FEIS "addressed site-specific future actions where those actions could be reasonably forecasted." *Rivers*, 2018 WL 6735090 *9. The 2016 FEIS "furnished a great deal of data and analysis concerning the direct, indirect, and cumulative impacts" and complied with NEPA. *Id*. *10.

## B. The Blue and Gold Harvest Plan

The Blue and Gold project implements the 2016 RMP on BLM-administered lands in the Roseburg District within Douglas County. See AR_00355. The nearest towns are Yoncalla, Sutherlin, and Oakland. AR_00353.

Blue and Gold is situated within a highly fragmented "checkerboard" ownership landscape of federal and private lands. AR_00964, _01025. As FWS

noted, the federal and non-federal managed lands in the affected watersheds "have a long history of forest management." AR_00604. Here is an illustrative blowup of AR_02982 that includes the project area:



BLM primarily developed Blue and Gold to meet the 2016 RMP's management direction for HLB lands to contribute timber volume to the ASQ.

AR_00354. The project area is within the highest concentration of potentially available ASQ volume within the Roseburg District. AR_00355. "To meet the minimum ASQ declaration" for fiscal year 2024 through at least fiscal year 2025, BLM "needs to harvest timber from the HLB" in the Blue and Gold area. *Id*.

BLM initiated NEPA public outreach for the project in December 2019. AR_00357. In July 2024, BLM published the EA and unsigned FONSI for public review. AR_02151-384. BLM described and assessed the effects of six project alternatives, including a "no-action" alternative. *See* AR_021650-66, AR_02171-73. BLM then reviewed and responded to public comments on the EA. *See* AR_01130 (spreadsheet); AR_00324-43 (appendix to September 2024 FONSI).

In September 2024, after the completion of formal ESA consultation with FWS, BLM published a final EA for the project along with a signed FONSI. AR_00344-579 (final EA); AR_00311-43 (signed FONSI); AR_00580-933 (FWS's biological opinion under the ESA). The final EA assessed six project alternatives. AR_00358-66. BLM in the signed FONSI selected alternative six for implementation. AR_00313.

Per BLM's September 2024 authorization of alternative 6, Blue and Gold includes commercial thinning and variable retention-regeneration harvest on

2,405 acres—738 acres of variable retention harvest and 1,667 acres of commercial thinning. *See* AR_00312.[1] These actions occur only on HLB lands *Id*. As authorized, the project also includes 73 acres of yarding wedges (mostly on HLB lands), 14.6 miles of road construction, and 74 miles of road renovation. *Id*.

Blue and Gold is slated to be implemented over a three- to-10-year period. AR_00354. In late September 2024, after BLM published its signed FONSI, the agency issued a Decision Record to specifically implement the Galagher Canyon and Tidy Bowl timber sales. AR_00286-310. The two sales together encompass 565 acres of harvest within the Blue and Gold project area. *See* AR_00288.

## PROCEDURAL HISTORY

Plaintiffs commenced this action in September 2024. ECF 1. After Plaintiffs amended their complaint, Defendant answered and lodged the administrative record. ECF 7, 14, 19-20.

On February 26, 2025, the parties filed a joint status report and stipulation. ECF 23. The parties agreed that ground-disturbing activities would proceed during this litigation on the Galagher Canyon and Tidy Bowl

---

[1] The 2015 RMP defines "variable retention harvest" at AR_08122 and "commercial thinning" at AR_08107.

timber sales (encompassing about 565 acres of harvest) and the Yellow
Panther timber sale that encompasses another 49 acres. *See id.* at 2;
AR_00286-310 (BLM's decision record for Galagher Canyon and Tidy Bowl).
The parties also agreed that BLM may auction additional sales but will not
award additional timber-sale contracts until briefing and oral argument on
summary judgment are complete. ECF 23 at 2.

**STATUTORY AND REGULATORY BACKGROUND**

**A.    The O&C Act**

BLM manages many lands in western Oregon under the Oregon and
California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937
("O&C Act"), 43 U.S.C. § 2601.

Blue and Gold's forest management activities take place almost
exclusively—95%—on O&C Act lands. AR_00354. "[T]he O & C Act
envisions timber production as a dominant use." *Headwaters, Inc. v. Bureau
of Land Mgmt.*, 914 F.2d 1174, 1184 (9th Cir. 1990). *Headwaters* rejected the
exemption of "certain timber resources from harvesting to serve as wildlife
habitat," because that was "inconsistent with the principle of sustained
yield." *Id.* at 1183.

To ensure sustained-yield timber harvest—meaning that timber can
consistently be cut and regrown in perpetuity without depleting forests—the

O&C Act requires BLM "to declare an annual productive capacity . . . by establishing the [ASQ]." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 791 (D.C. Cir. 2023) (cleaned up).  The ASQ is BLM's "estimate of the volume of O&C timber that can be cut and sold in a given year without depleting the timberland."  *Id.*

## B.    The Federal Land Policy and Management Act ("FLPMA")

BLM uses FLPMA's land use planning process to guide its management of federal lands, including O&C Act lands.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004).  A land use plan, or RMP, is "generally a statement of priorities."  *Id*. at 59, 71 (cleaned up); *see* 43 C.F.R. § 1601.0-5(n).  An RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  *Norton*, 542 U.S. at 59 (cleaned up).  Once an RMP is developed, BLM manages those lands "under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a). However, regarding O&C Act lands, FLPMA provides that the O&C Act— which envisions timber-production dominant use—"shall prevail" over FLPMA as it relates to "management of timber resources."  43 U.S.C. § 1701 note.

RMPs generally do not authorize on-the-ground actions, which BLM authorizes separately through site-specific implementation decisions.  43

C.F.R. § 1601.0-5(n).  These decisions must be "in accordance with" the RMP.

43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) ("[F]uture resource

management authorizations . . . shall conform to the approved plan.").

Under FLPMA, BLM has "a great deal of discretion in deciding how to

achieve" compliance with an RMP.  *Norton*, 542 U.S. at 66.  Courts "normally

afford deference to an administrative agency's interpretation of its own

regulations," including RMPs.  *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1,

42 (9th Cir. 2025) (cleaned up).

## C.      The National Environmental Policy Act ("NEPA")

NEPA's purpose is twofold: (1) to ensure that agencies carefully

consider information about significant environmental impacts in proposing

actions, and; (2) to guarantee relevant information is available to the public.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Under NEPA, an agency "must make predictive and scientific

judgments in assessing the relevant impacts," including whether impacts

"rise to the level of 'significant.'"  *Seven Cnty. Infrastructure Coal. v. Eagle

Cnty., Colo.*, 605 U.S. ____, 2025 WL 1520964, *7 (May 29, 2025). When an

agency makes such judgments, "and decides what qualifies as significant," a

reviewing court must be at its most deferential."  *Id.*  (cleaned up)  NEPA "is

purely procedural," "imposes no substantive environmental obligations or

restrictions," and does not constrain an agency "from deciding that other values outweigh the environmental costs." *Id.*\*3, \*5.

Before approving an RMP, BLM must prepare an Environmental Impact Statement ("EIS") under NEPA. 43 C.F.R. § 1601.0-6. Later actions taken to implement an RMP are separately analyzed as appropriate. When doing so, NEPA's implementing regulations encouraged BLM to "tier" its analysis by "incorporat[ing] discussions from the broader [EIS] by reference" and concentrat[ing] on the issues specific to the subsequent action." 40 C.F.R. §§ 1508.28, 1502.20[2]; *Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 WL 975179, \*6 (D. Or. March 31, 2025) (discussing NEPA tiering).

To satisfy NEPA's procedural requirements—under the regulations that were in effect during Blue and Gold's planning process—an agency may prepare an Environmental Assessment ("EA") for a proposed action if it is not likely to have significant effects or the significance of the effects is unknown. 40 C.F.R. § 1501.3(c)(2). "The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a concise public document that serves to briefly provide sufficient evidence and

---

[2] The NEPA regulations at 40 C.F.R. were rescinded in their entirety, effective April 11, 2025. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025). The 40 C.F.R. regulations were, however, in place through the time of the challenged September 2024 Blue and Gold decision.

analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (cleaned up).

"NEPA does not require the agency to weigh environmental consequences in any particular way." *Seven County*, 2025 WL 1520964, *3. Further, under NEPA, "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion." *Id.* *7.

## STANDARD FOR JUDICIAL REVIEW

None of the statutes at issue in this action contain a provision for judicial review, so review here proceeds under the Administrative Procedure Act ("APA"). *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004); 5 U.S.C. § 706(2)(A).

Whether BLM complied with FLPMA and NEPA is reviewed under the APA's deferential arbitrary and capricious standard. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 871 (9th Cir. 2022).

Under the APA, "[a]n agency will have acted arbitrarily and capriciously only when the record plainly demonstrates that [the agency] made a clear error in judgment." *Tri-Valley CAREs*, 671 F.3d at 1124 (cleaned up); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th

Cir. 1986) ("The court may not set aside agency action as arbitrary or
capricious unless there is no rational basis for the action.").  The party
challenging a decision as arbitrary and capricious bears the burden of proof
and persuasion.  *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*,
61 F.4th 633, 639–40 (9th Cir. 2023).

Judicial review of federal agency actions under the APA is exceedingly
deferential—the court may not substitute its judgment for that of the agency.
"[T]he central principle of judicial review in NEPA cases is deference." *Seven
Cnty*, *6.  *See Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008)
(en banc); *Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29, 42-43 (1983).  Courts "will uphold a decision of less than ideal
clarity if the agency's path may reasonably be discerned." *Bowman Transp.,
Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citation
omitted).

This Court's role in reviewing administrative proceedings is to
determine "whether or not as a matter of law the evidence in the
administrative record permitted the agency to make the decision it did."
*Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).
Accordingly, summary judgment "is an appropriate mechanism for deciding
the legal question of whether the agency could reasonably have found the

facts as it did." *Id.* at 770.

## ARGUMENT

**I.    Blue and Gold is consistent with the 2016 RMP's direction for individual-tree retention and complies with FLPMA.**

### A.    BLM complied with FLPMA.

BLM's authorization of Blue and Gold is consistent with the 2016 RMP's direction for retention of individual older and larger trees and therefore complies with FLPMA.

The EA shows that BLM was well aware of the 2016 RMP's management direction that requires BLM to retain individual older and larger trees and that BLM planned Blue and Gold to be consistent with that provision. *See* AR_00361. For the HLB timber harvest encompassed by the project, BLM specified that implementation would follow the "RMP direction for retention." AR_00369, _00361. BLM "would adhere to the specific management direction" in the 2016 RMP. AR_00360, AR_00361.

The specific management direction in the 2016 RMP provides that BLM "[i]nclude among retained trees all trees that are both ≥40 DBH[3] and that the BLM identifies were established prior to 1850, except where falling is necessary for safety or operational reasons and no alternative harvesting

---

[3] DBH = diameter at breast height. *See* AR_08109 (2016 RMP's definition of the term).

method is economically viable or practically feasible." AR_07876, _07878, _07879.

This tree retention provision confers express discretion with BLM regarding how the agency identifies the age of such trees. "BLM identification of trees established prior to 1850 may be based on any of a variety of methods, such as evaluation of bark, limb, trunk, or crown characteristics, or increment coring, at the discretion of the BLM." *Id*.

The tree retention provision is explicitly applicable to individual trees and is not a more sweeping stand-retention provision. A tree is different from a stand. The 2016 RMP defines "stand" as an "aggregation" of trees that is managed as a discrete unit. AR_08120. A stand may be composed of trees and groups of trees of a variety of ages and may contain multiple land use allocations. *Id*. The 2016 RMP is also clear that it does not intend to set aside stands in HLB from timber harvest. There are no timber harvest restrictions in the HLB related to general stand age and/or retaining stands above a particular average age or size. Instead, the lead management objective for HLB lands is to "[m]anage forest <u>stands</u> to achieve continual timber production that can be sustained through a balance of growth and harvest." AR_07875 (underlining added).

The 2016 RMP's tree retention provision is not a stand-retention

provision.  The 2016 RMP specifies that "BLM will not defer or forego timber harvest of <u>stands</u> in the [HLB] for reasons not described in the management direction or in Appendix A."  AR_07846 (underlining added).  Neither the HLB management direction nor Appendix A describes stand age as a limiting factor or restriction on HLB stands.  See AR_07875-79 (HLB management direction), AR_07919-30 (Appendix A).

The 2016 RMP expressly rejected the notion that stand age is an appropriate factor on which to restrict HLB timber harvest.  AR_07849.  It rejected a management alternative in which all stands 80 years and older would be protected as LSR.  *Id*.  Instead, the 2016 RMP established that "[b]y the allocation of the [HLB], the BLM makes all lands within this land use allocation available for timber harvest."  AR_07920.  As this Court found in a similar context, reserving additional HLB lands for NSO protection "would likely be found inconsistent with the management directions in the RMP and perhaps even violate FLPMA."  *Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 1:19-cv-01810-CL, 2021 WL5356969, *8 (D. Or. Aug. 24, 2021), *aff'd*, 2022 WL 17222416 (9th Cir. Nov. 24, 2022).

For these reasons, this Court should grant summary judgment to Defendants against Plaintiffs' FLPMA claim.

### B.    None of Plaintiffs' summary judgment arguments show that Blue and Gold is inconsistent with the 2016 RMP.

#### 1. Plaintiffs' second-guessing of the 2016 RMP is off limits.

Plaintiffs insinuate that BLM was wrongly "able to reallocate" "mature and old growth forest areas into the HLB" for the 2016 RMP by relying on inaccurate stand ages. Pls.' Mem. 10. But this reads as a challenge to BLM's determinations of land use allocations in 2016 and all three Plaintiffs here already challenged the 2016 RMP unsuccessfully; both this Court and the Ninth Circuit upheld the 2016 RMP. *Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018), *aff'd*, 815 Fed. App'x 107, 110 (9th Cir. May 15, 2020). In any event, Plaintiffs' complaint does not challenge the 2016 RMP, and under the applicable six-year statute of limitations it is too late to challenge it now. 28 U.S.C. § 2401(a).

#### 2. Plaintiffs mischaracterize the 2016 RMP.

Plaintiffs claim that some of the HLB lands in Blue and Gold were formerly allocated as LSR prior to the 2016 RMP. Pls.' Mem. 17-18. Plaintiffs insinuate that BLM violated FLPMA because it "target[ed] these areas" for harvest in Blue and Gold. *See id.* at 18.

Plaintiffs are wrong. The 2016 RMP directs that BLM manage HLB lands for timber harvest. BLM "will conduct timber harvest on all lands within [HLB] over time." AR_07920. BLM would run afoul of FLPMA by

proceeding as if HLB lands that were allocated to the LSR under the prior RMP were still LSR under the 2016 RMP. That is because the 2016 RMP specifies that projects such as Blue and Gold "must be consistent with the management direction in the approved [2016] RMP." AR_07829. Blue and Gold was developed under the 2016 RMP and must adhere to its management direction. It would be inconsistent with the 2016 RMP—and a FLPMA violation—to treat existing HLB lands as if they were LSR lands.

Plaintiffs also mischaracterize the tree retention provision in the 2016 RMP. The provision, by its terms, provides that BLM—subject to safety or operational exceptions—retain trees that are above a specified diameter and age. AR_07876, _07878, _07879. The provision, further, commits tree-aging methodology to BLM discretion. *Id*. The provision is not a stand-level retention measure. *See supra* Argument I.A. Avoiding the provision's actual text and context, Plaintiffs suggest the tree retention provision is a broad protection for "areas," "old-growth," and "stands" rather than particular trees. Pls.' Mem. 18, 22. Plaintiffs also ignore that the 2016 RMP expressly rejected that HLB stands above a certain age should be excluded from timber harvest. AR_07849.

Plaintiffs argue that Blue and Gold is inconsistent with the 2016 RMP because there is evidence that "contradicted the EA's description of stand

ages and conditions." Pls.' Mem. 22. But stand ages and conditions is a different issue than the size and age of individual trees. *See supra* Argument I.A.

### 3. The Reeder and Reid comment letters do not show any inconsistency with the 2016 RMP.

To try to establish their FLPMA claim, Plaintiffs rely on Mr. Reeder and Ms. Reid's public comment letters on Blue and Gold. Pls.' Mem. 20 (citing AR_01202-07 (Reeder) and AR_01208-11 (Reid)). But Mr. Reeder's comment letter made no mention of FLPMA or of the tree retention provision in the 2016 RMP. AR_01202-07. Mr. Reeder disagreed with BLM's "stand structural class" designations for certain timber units— but raised no concern regarding consistency with the 2016 RMP's tree retention provision. *See* AR_01203-04. As for Ms. Reid, she doubted that a certain Blue and Gold "stand should be in a harvest project," because there "were older trees than 90 in the stand." AR_01209. But she, like Mr. Reeder, made no mention of FLPMA or of the tree retention provision in the 2016 RMP—nor did she voice any concerns with Blue and Gold's compliance with this provision. AR_01202-07. Plaintiffs also cite Ms. Reid's comments at AR_01138 regarding the importance of legacy trees, but the point of the tree retention provision is to protect such larger and older trees. Plaintiffs fail to show that Blue and Gold is inconsistent with the 2016 RMP.

Page 19    Defendant's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment

Nor does a disagreement between BLM and some individuals regarding stand ages/conditions show that BLM was arbitrary and capricious.  An agency may rely on its own expertise and predictions.  *See Cal. by and through Becerra v. Azar*, 950 F.3d 1067, 1100 (9th Cir. 2020) (en banc).  Even hen qualified experts disagree, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts."  *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 449 (9th Cir. 2024) (cleaned up).  Here, the individuals disagreeing with BLM are not qualified forestry experts but are biologists without expertise to age stands for forest management.  Further, "[c]omplete factual support" for an agency's prediction is not "possible or required."  *Cal.*, 950 F.3d at 1096 (cleaned up).

### 4. Plaintiffs' ESA-based argument does not show a FLPMA violation.

Far from "guaranteeing that large old trees will be cut," Pls.' Mem. 22, BLM made clear that Blue and Gold would protect larger and older individual trees in conformance with the management direction in the 2016 RMP.  Plaintiffs attempt to rely on an excerpt from FWS's biological opinion, an ESA consultation document, to show that the tree retention provision will be violated.  Pls.' Mem. 23.  But FWS noted that BLM would retain certain percentages of preharvest stand basal area (AR_00733) and the EA specified that BLM would include the trees retained under the 2016 RMP provision as

part of this basal area.  AR_00361.

Plaintiffs are also wrong in relying on FWS's statement regarding 2,590 acres of murrelet habitat removal for a FLPMA violation.  Pls.' Mem. 23. Plaintiffs fail to acknowledge that this tally includes 945 acres of recruitment habitat that FWS found generally comprises 40-70 year old stands.  *See* AR_00733-34.  Nor does an acreage of overall murrelet habitat relate to individual trees within an acreage that are retained under the 2016 RMP.

> **5. Plaintiffs' FLPMA argument relies heavily on inappropriate extra-record evidence; in any event, the evidence shows no inconsistency with the 2016 RMP.**

Plaintiffs' FLPMA argument is heavily salted with extra-record evidence that is inappropriate to consider in judicial review here.  *See*, *e.g.*, Pls.' Mem. 19-20, 22.  Plaintiffs rely on a 2019 email exchange between BLM biology staff.  This document is not properly part of judicial review here, as Defendant explains in its accompanying response to Plaintiffs' motion to complete/supplement the record.

Even if the document is considered, it goes nowhere for Plaintiffs.  The 2019 exchange not only pre-dates the initial NEPA public outreach for Blue and Gold but pre-dates the EA at issue by five years.  The 2019 exchange, further, is between two BLM wildlife biologists and discusses using stand age as a starting point to determine and classify habitat type for NSOs and

murrelets in the Roseburg District's habitat layer.  ECF 25-4 at pp. 79-80;
Sean Jeronimo Decl. ¶ 33.  Nor does the exchange relate to the 2016 RMP's
provision for retaining individual trees above a certain size and age.

Plaintiffs' FLPMA argument is based on the following: because BLM
inaccurately aged the stands in the Blue and Gold project area, BLM is
therefore in violation of the tree retention management direction in the 2016
RMP.  But as described above, not only have Plaintiffs pointed to no evidence
that BLM will not retain trees as required by the RMP, but Plaintiffs have
not pointed to any evidence that shows BLM aged the stands incorrectly. The
process by which BLM ages a stand includes the steps of stand delineation,
classification of one or more vegetative layers within the stand, and
identification of which layer is the primary focus for management.  Sean
Jeronimo Decl. ¶ 6 . BLM forestry field staff are responsible for aging the
stands in their District and utilize their professional judgment at each step.
*Id*. Each stand has an age class layer that hosts the dominant vegetation type
for which the stand is primarily being managed. *Id*. ¶ 11; AR_02915-16. A
forester uses judgement and knowledge of the stand's history and planned
future management to classify layers based on their ecological functions in
the context of BLM's management. *Id*. ¶ 12. Then, the forester exercises
further judgment and expertise to select a stand age that best indicates the

management options available for the stand. *Id*. ¶ 15.

BLM followed the proper process to age the stands in the Blue and Gold project area. It installed more than 1,200 stand exam plots and used that field-collected data to validate the stand ages. AR_00368; AR_00527. Forestry staff then refined the management units and used 724 final plots. *See* AR_01490-2137; AR_05212-372; AR_05935-6110; AR_05081-211; AR_04899-5080; AR_04713-898; AR_04444-712; AR_04084-115. See Jeronimo Decl. ¶¶ 19-27 for further explanation. Plaintiffs do not explain the above process to the court at all or identify a single flaw in any of the documents highlighted above. Rather, Plaintiffs seem to argue that the correct age of a stand is the age of the oldest trees in the stand or the age BLM wildlife biologists use for a District habitat layer. As explained above, the process by which BLM forestry staff age a stand for the purpose of forest management contains judgment calls based on the individual's forestry expertise and Plaintiffs have not identified any substantive deficiencies in the process BLM utilized.

**6. Plaintiffs' FLPMA argument also relies heavily on post-decisional declarations that are off limits in APA merits review.**

Plaintiffs' FLPMA argument extensively relies on extra-record declarations from Mr. Reeder and Ms. Reid that were signed after the fact of the challenged Blue and Gold EA and FONSI—and after Plaintiffs filed this

action.  ECF 27-2 (Reeder), 27-3 (Reid).  Defendant objects to the

declarations.  They are an inappropriately late attack on the merits of the

agency's decision and should not be considered under clear Ninth Circuit

precedent.[4]  *See* LR 56-1(b).[5]  *See Tri-Valley CARES v. U.S. Dep't of Energy*,

671 F.3d 1113, 1131 (9th Cir. 2012) (rejecting attempt to supplement AR with

materials that post-date the filing of the litigation).

 Parties may not use "post-decision information as a new rationalization

either for sustaining or attacking the agency's decision." *Ass'n of Pac.*

*Fisheries v. EPA*, 615 F.2d 794, 811–12 (9th Cir. 1980).  In *Sw. Ctr. for*

*Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996),

a party offered extra-record documents, including a letter dated a month

after the agency decision was completed.  The Ninth Circuit held, however,

that post-decision information "may not be advanced as a new rationalization

. . . for attacking an agency's decision."  *Id.* at 1451-52.

 This case is akin to *Southwest Center*.  Here, the post-decision

---

[4] Defendant does not object to Plaintiffs' declarations for the specific purpose
of establishing Plaintiffs' standing, and Defendant does not contest Plaintiffs'
standing.  That said, Plaintiffs in their summary judgment memo rely on
their declarations extensively to attempt to establish a new factual record
and prove the merits of their claims against BLM.  This is improper.

[5] Pursuant to LR 7-1(a), Defendant's counsel conferred with Plaintiffs'
counsel regarding this evidentiary objection and the parties were not able to
resolve the objection.

declarations from Mr. Reeder and Ms. Reid are outside the administrative record, inappropriate to consider in APA judicial review, and cannot be used to attack BLM.  *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (preventing a plaintiff's attempt to introduce post-decisional evidence).

If this Court is considering the post-decision declarations, this Court should consider the rebuttal declaration of Sean Jeronimo accompanying this cross-motion and memo.  The declaration is offered to explain technical matters/complex subject matter, to show that BLM considered all relevant factors, and to address Plaintiffs' flawed representations and arguments.

For all these reasons, this Court should grant summary judgment to Defendant against Plaintiffs' FLPMA claim.

## II.    BLM undertook the requisite NEPA hard look at the effects of Blue and Gold.

In the Blue and Gold EA, BLM undertook the requisite NEPA hard look at the environmental effects of the project.  AR_00344-579 (EA); AR_324-43 (response to comments).  An EA takes a hard look if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences."  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  The court makes "a pragmatic judgment whether the [EA's] form, content and preparation foster both informed decision-making

and informed public participation." *Churchill Cty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (cleaned up).

BLM undertook a reasonable assessment of the effects of Blue and Gold. When assessing environmental effects under NEPA, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. __, __ (2025), 2025 WL 1520964, *8. Courts should afford an agency "substantial deference" in these choices and not "micromanage" them if "they fall within a broad zone of reasonableness." *Id.* The question of whether an agency's NEPA report "is detailed enough in a particular case [] requires the exercise of agency discretion." *Id.* *7.

### A.   BLM's EA provided sufficient information to allow the public to weigh in regarding the project's effects on stands and trees.

With the Blue and Gold EA, BLM provided its calculations of current forest stand attributes for each harvest unit in the project. AR_00527-28.

BLM gave the public sufficient information about its methodology and calculations of stand ages, AR_00352-53, allowing Plaintiffs to weigh in with their views. Under NEPA, an "EA must only provide the public with sufficient environmental information, considered in the totality of the

circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).  (cleaned up).  BLM gave Plaintiffs information about its stand calculations—for every Blue and Gold unit—Plaintiffs were able to weigh in with their views.  BLM complied with NEPA's procedural requirements.

Plaintiffs argue that BLM was arbitrary and capricious because they believe the agency's stand and tree data are incorrect.  Pls.' Mem. 25-26.  But BLM's approach is well supported; it is based on an identified methodology and studies of local forest stand conditions.  *See* Sean Jeronimo Declaration ¶¶ 18-27; AR_02888-977 (describing BLM's forest data standards); AR_03982-4149 (BLM's EcoSurvey technical appendix, regarding calculating stand/tree information; AR_01490-2137 (Blue and Gold tree list); AR_05212-372 (number and volume of merchantable trees); AR_05935-6110 (Blue and Gold plot summaries); AR_04899-5080 (showing density and volume of trees by species and diameter); AR_04713-898 (merchantable tree summary); AR_04444-712 (merchantable tree plot summary); AR_05391-469 (Blue and Gold site tree summary).

Plaintiffs' disagreement with or confusion over BLM's approach to how it ages stands for forest management fails to establish any NEPA violation.

Courts under NEPA "apply the highest level of deference" in reviewing an agency's "scientific judgments in selecting [a] methodology." *Native Ecosystems*, 697 F.3d at 1053.  Courts "defer to agency decisions so long as those conclusions are supported by studies that the agency deems reliable." *Id.*

Beyond these points, Plaintiffs' argument is thin that BLM was arbitrary and capricious in looking to its own data and methodology. Plaintiffs rely, as with their FLPMA claim, on objectionable extra-record materials.  *See* Pls.' Mem. 25 (citing post-decisional Reeder declaration and extra-record 2019 email); *supra* Argument I.B.5, I.B.6.  Plaintiffs say the EA failed to mention "the presence of ancient trees," Pls.' Mem. 25, but that is wrong because the EA emphasized that larger and older trees would be retained per the 2016 RMP's tree retention provision.  AR_00361.

For these reasons, this Court should grant summary judgment to Defendant against Plaintiffs' NEPA hard look claim.

## B.    BLM adequately addressed the effects of timber harvest on carbon storage and climate change.

As part of the Blue and Gold EA, BLM addressed how the project would affect carbon storage, greenhouse gas emissions, climate change, and the social cost of carbon.  AR_00498-500.  BLM rationally found that these effects did not warrant detailed analysis; the agency predicted that "there would be

no reasonably foreseeable significant effects . . . beyond those disclosed" in the 2016 FEIS. AR_00500. The 2016 FEIS already addressed the effects of timber harvest across all western Oregon lands on carbon storage and greenhouse gas emissions. AR_ 08329-44, AR_08786-88, AR_08809, AR_08842, AR_08846, AR_09503-12.

BLM tiered the Blue and Gold NEPA analysis of carbon storage and climate change to the detailed NEPA analysis in the 2016 FEIS and provided specific further information regarding the Roseburg BLM lands at issue. *See* AR_00499-50. For example, BLM discussed the 2020 Archie Creek wildfire and explained why it did not change the effects predicted in the 2016 FEIS, and BLM noted that the timber volume anticipated for the Roseburg District is well within the volume assumed in the 2016 FEIS for its carbon storage and greenhouse gas emissions NEPA analysis. AR_00499-500.

This Court has repeatedly recognized that BLM EAs prepared after the 2016 RMP/2016 FEIS may tier under NEPA to the 2016 FEIS. *See Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 WL 975179, *10 (D. Or. March 31, 2025) (citing cases); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 1:19-cv-01810-CL, 2021 WL5356969, *6-*8 (D. Or. Aug. 24, 2021), *aff'd*, 2022 WL 17222416 (9th Cir. Nov. 24, 2022). When a broad EIS has been prepared, and a subsequent EA is prepared for action included in the broader

program—such as timber harvest—the EA can summarize and incorporate the prior EIS discussion. *Id.* \*6 (citing authorities). In the EA, the agency can concentrate on any issues specific to that subsequent action. *Id.*

For Blue and Gold, BLM's EA appropriately tiered to the 2016 FEIS and rationally explained why effects on carbon storage and climate change were not considered in detail.

Relying heavily on *Ctr. for Biological Diversity v. U.S. Forest Serv.* ("*Black Ram*"), 687 F. Supp. 3d 1053 (D. Mont. 2023), Plaintiffs argue that BLM was arbitrary and capricious. But *Black Ram* is not persuasive here for several reasons. First, *Black Ram* did not involve NEPA tiering at all. *Black Ram* did not involve the scenario of a BLM timber EA referencing and incorporating NEPA analysis in the 2016 FEIS, a scenario that this Court has repeatedly reviewed and found for BLM. *See Wildlands*, 2025 WL 975179, \*9. In Blue and Gold, unlike in *Black Ram*, the agency had already prepared a detailed NEPA analysis in the 2016 FEIS that assessed the effects of timber harvest on carbon storage and climate change under the 2016 RMP. That analysis encompassed all timber harvest on lands in the RMP planning area, including the timber harvest in Blue and Gold; Blue and Gold is designed and intended to carry out the timber harvest authorized in the 2016 RMP and analyzed in the 2016 FEIS. In the Blue and Gold EA, BLM

explained why further review of carbon storage and climate change was not necessary and cited specific project-relevant facts that show that its judgment was reasonable.  AR_00498-500.

Next, *Black Ram* is unpersuasive considering the Supreme Court's *Seven County* decision.  Plaintiffs fault BLM for placing its discussion in an EA appendix, "most of which" summarized the analysis from the 2016 FEIS. Pls.' Mem. 27.  But per *Seven County*, BLM's judgment that Blue and Gold would not present reasonably foreseeable significant effects beyond those disclosed in the 2016 FEIS merits the highest deference.  Under NEPA, "when an agency makes . . . speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." *Seven Cnty.*, 2025 WL 1520964, *7 (cleaned up).[6]

For Blue and Gold, Plaintiffs demand that BLM under NEPA quantify the stored carbon removed, the emissions generated, and the expected time over which carbon would be recaptured. Pls.' Mem. 28-29.  But none of this detailed quantification is required by NEPA.  NEPA "does not require the agency to weigh environmental consequences in any particular way."  *Seven*

---

[6] *Black Ram*'s discussion of the agency's review of climate impacts does not reference or apply any level of deference.

Defendant's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment

*Cnty.* \*3.  As *Seven County* established, when an agency assesses environmental effects under NEPA, judicial review should afford an agency "substantial deference" in its choices and not "micromanage" those choices if "they fall within a broad zone of reasonableness." *Id.* \*8.  BLM's choice here on how to address carbon storage and climate change effects—considering the detailed analysis already undertaken in the 2016 FEIS—is well within a broad zone of reasonableness.

Finally, Blue and Gold 's NEPA review is consistent with Ninth Circuit precedent.  In *Hapner v. Tidwell,* 621 F.3d 1239, 1245 (9th Cir. 2010), the Ninth Circuit upheld an agency when a project EA did not discuss global warming but where the agency elsewhere briefly discussed the issue in proportion with its significance.  Plaintiffs fail to mention this precedential ruling in their summary judgment memo.  Here, BLM discussed the issue in its EA and its discussion was reasonable per *Hapner* considering BLM's finding that Blue and Gold would not present significant effects beyond those already disclosed in the 2016 FEIS.

For these reasons, this Court should grant summary judgment to Defendant against Plaintiffs' NEPA hard look claim.

### III. BLM rationally found that an EIS was not needed for Blue and Gold.

NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(c).  Here, BLM weighed the appropriate factors in determining the NEPA significance of Blue and Gold.  40 C.F.R. § 1501.3(d); AR_00311-23.  BLM rationally predicted that Blue and Gold would not have significant effects under NEPA and that an EIS was therefore not required.

BLM's effects finding is well supported by the record and merits substantial deference.  Under NEPA, an agency "must make predictive and scientific judgments in assessing the relevant impacts," including whether impacts "rise to the level of 'significant.'"  *Seven Cnty.*, *7.  When an agency makes such judgments, "and decides what qualifies as significant," a reviewing court must be at its most deferential."  *Id.*

BLM's determination to not undertake an EIS for Blue and Gold is also well supported by precedent.  "A comprehensive programmatic [EIS] generally obviates the need for a subsequent site-specific or project-specific [EIS], unless new and significant environmental impacts arise that were not previously considered."  *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).  Prior to Blue and Gold, BLM had already prepared a comprehensive programmatic EIS (the 2016 FEIS) addressing the effects of

HLB timber harvest on lands including those in the Blue and Gold project area. It was not necessary for BLM to prepare another EIS just for Blue and Gold. Illustratively, the 2016 FEIS already assessed the effects of timber harvest across all HLB lands to contribute timber volume to the ASQ. *See*, *e.g.*, AR_08292, _08506, _08509-19. Another EIS was not necessary. BLM's prediction that Blue and Gold would have insignificant effects under NEPA merits the highest deference. *See Seven Cnty.*, *7.

Plaintiffs argue that five NEPA intensity factors mandated preparation of an EIS for Blue and Gold. Pl.'s Mem. 30-35. But as Defendants explain below, BLM's NEPA significance predictions merit the highest deference. They are entirely rational considering Blue and Gold's context and intensity.

### A.  BLM rationally predicted that the potential effects of the project would not be highly uncertain to the extent that required an EIS.

BLM rationally predicted that Blue and Gold would not have highly uncertain effects requiring an EIS. *See* 40 C.F.R. § 1501.3(d)(2)(iv); AR_00320-21. As BLM noted, the Roseburg District has been operating under the 2016 RMP for years and has conducted timber harvest and associated activities for decades. AR_00320. As decided in the 2016 RMP, HLB lands are managed for sustained-yield timber production. AR_07849, AR_07875. Blue and Gold is an HLB project almost entirely on O&C Act lands where "timber production [is] a

dominant use." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1184 (9th Cir. 1990). Plaintiffs fail to show that another EIS was needed for Blue and Gold—on top of the 2016 FEIS—for a project that is meant to carry out the 2016 RMP on the very lands that are allocated for timber harvest. This Court has repeatedly rejected the arguments that non-programmatic timber projects under the 2016 RMP require their own EISs. *See Wildlands v. Adcock*, No. 6:22-cv-00767-AA, 2025 WL 975179, *10 (D. Or. March 31, 2025) (citing cases); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 1:19-cv-01810-CL, 2021 WL5356969, *6-*8 (D. Or. Aug. 24, 2021), *aff'd*, 2022 WL 17222416 (9th Cir. Nov. 24, 2022).

NEPA "regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (cleaned up). Here, BLM used its stand data and expertise to assess the level of uncertainty and made "reasonable predictions on the basis of prior data" to conclude that there would be no significant environmental impact. *Id.* "[T]here will always be some uncertainty about the effects of land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly uncertain." AR_13228 (BLM NEPA handbook).

Page 35      Defendant's Cross-Motion for Summary Judgment and Response
             to Plaintiffs' Motion for Summary Judgment

Plaintiffs argue that there is "substantial uncertainty" about stand ages and to what extent ancient trees would be protected. Pls.' Mem. 30. But BLM provided comprehensive stand age and related data for each harvest unit and emphasized that larger and older trees would be protected from harvest as required by the 2016 RMP's management direction. *See*, *e.g.*, AR_00527-28, AR_00361. BLM's FONSI passes muster because the agency "relied on its own predictions" within its area of discretion and expertise. *Cal. by and through Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (en banc) (cleaned up). "Complete factual support" for an agency's prediction is not "possible or required." *Id.* (cleaned up)

In a single sentence, Plaintiffs argue that there is "additional uncertainty" regarding Blue and Gold's effects on carbon and climate. But Plaintiffs do not explain how this project's effects are highly uncertain considering the EA's discussion and the backdrop of the analysis already conducted in the 2016 FEIS. *See* AR_00498-500. Plaintiffs fail to rebut the presumptive validity of the FONSI. They fail to identify anything about Blue and Gold that presents highly uncertain effects on carbon and climate that would require preparation of an EIS. The applicable "arbitrary and capricious" review standard is "highly deferential, presuming the agency action to be valid." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)

(cleaned up).

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's claim that an EIS was required under 40 C.F.R. § 1501.3(d)(2)(iv).

## B.    BLM rationally predicted that Blue and Gold would not have effects on ESA-listed species requiring an EIS.

BLM analyzed effects to NSOs and their habitat in detail and tiered that analysis to the 2016 FEIS.  AR_00372-91.  BLM rationally predicted that Blue and Gold would not have adverse effects on endangered or threatened species or habitat that would require preparation of an EIS.  *See* 40 C.F.R. § 1501.3(d)(2)(vi); AR_00321-22.

BLM reasonably predicted that Blue and Gold's effects on NSOs and marbled murrelets would not be significant under NEPA.  When an agency decides what effects qualify as significant under NEPA, "a reviewing court must be at its most deferential."  *Seven Cnty,* *7 (cleaned up).  *See Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1207 (E.D. Cal. 2017) ("Although the Project will have some impact on the NSOs in the Project area, the Court defers to the [agency's] finding that the impact is not significant.").

**1.  The intensity of effects on NSOs did not require an EIS.**

For NSOs, Blue and Gold "is not expected to impair any spotted owls." AR_00750.  The project would avoid "incidental take" of territorial pairs and resident singles.[7]  AR_00313.  BLM "would not authorize" timber sales  if they would cause take.   AR__00372, AR_00480.   If NSOs are detected during implementation surveys, BLM would modify or defer harvest to avoid take. *Id*.; AR_00750.  And Blue and Gold has additional project provisions aimed at NSO protection.  *See* AR_00477-78.

In the FONSI, BLM acknowledged that Blue and Gold would adversely affect some NSO habitat.  AR_00316.  But BLM rationally found that these effects were not at an intensity level to require an EIS.  *See Bark v. Northrop*, 607 Fed. App'x 652, 655 (9th Cir. April 15, 2015) (recognizing that an agency can "reasonably rel[y] on its own expert reports and technical expertise in concluding that the impacts of the project would be insignificant").

In determining NEPA significance, an agency must "consider the degree of adverse effect on a species, not the impact on individuals of that species." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006). For Blue and Gold, the administrative record shows that NSOs would not be impaired and that there would be limited local effects on NSO habitat.  As this

---

[7] The ESA terms "take" and "incidental take" are defined at AR_00757.

Court has recognized, NEPA does not require the preparation of an EIS whenever a federal agency discloses adverse impacts. *Bark v. Northrop*, No. 3:13-cv-00828-AA, 2016 WL 1181672, *14-*15 (D. Or. March 25, 2016) (relying on Ninth Circuit precedents).

For Blue and Gold, BLM's choice to prepare a FONSI rather than EIS is rational and supported not just by the EA's analysis (*see* AR_00371-91) but by the administrative record as a whole. The adverse NSO habitat effects "would not represent a meaningful reduction in the amount of designated critical habitat, nor will the effects compromise the capability of the affected [critical habitat] sub-units to fulfill their conservation functions" for the NSO. AR_00731; see *also* AR_00751. The Blue and Gold project is "not expected to significantly alter the ability" of the affected critical habitat "to provide their intended functions of demographic support and connectivity for spotted owls." AR_00729. Blue and Gold would remove some NSO dispersal habitat but "will not compromise the dispersal function of the landscape." AR_00750. The project would lead to "a less than 1 percent reduction" in this habitat baseline within the relevant critical habitat sub-unit. AR_00730.

## 2.  The intensity of effects on murrelets did not require an EIS.

In the FONSI, BLM predicted that the project would adversely affect murrelets but that there would not be any significant effects to the species and its habitat beyond those analyzed in the 2016 FEIS.  AR_00316-17. Given the limited intensity of the predicted effects, BLM rationally found that an EIS was not necessary, and judicial review is at its "most deferential" regarding the agency's predictions of NEPA significance. *Seven Cnty.*, *7.

The record bolsters BLM's finding—Blue and Gold would have localized effects on murrelets and habitat that do not extend to a species-level effect. The project is expected to "take" 13 murrelet chicks over the next 20 years, but this loss would be mitigated by the predicted production of nearly 10 chicks/year from the remaining murrelet sites.  AR_0744. Therefore, there are "no resounding effects of the [project] on murrelet numbers, distribution, or survival at the Action Area, Conservation Zone, or Range-wide scales." AR_00744, AR_00753.  The project would remove 1,787 acres of murrelet nesting habitat but that "will not resonate" at the critical habitat subunit and rangewide scales.  AR_00753-54, AR_00756.

Plaintiffs fail to establish that BLM's NEPA-significance predictions were arbitrary and capricious.  Plaintiffs rely on objectionable evidence outside the administrative record.  *See* Pls.' Mem. 32.  Plaintiffs also focus on RA32

habitat even though it was established in the 2016 RMP that BLM will not defer or forego harvest in the HLB to contribute further to RA32; the large LSR network established in the 2016 RMP constitutes BLM's contribution to RA32 habitat.  *See* AR_00331-32.

Plaintiffs rely on *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1282-3 (D. Or. 2013).  Pl.'s Mem. 32.  But that case involved a different project and differing circumstances.  Unlike the agency in *Cascadia Wildlands*, illustratively, in this case BLM already undertook an EIS in 2016 to study the effects of HLB timber harvest on NSOs and murrelets.  *See* AR_00316-17 (FONSI's discussion of the analysis in the 2016 FEIS).  Plaintiffs fail to establish that another EIS was required for a project meant simply to implement the 2016 RMP.  Further, *Cascadia Wildlands* has little to no persuasive weight given the Supreme Court's recognition that courts are at their most deferential in reviewing agency predictions regarding NEPA significance. *See Seven Cnty.*, *7.

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's claim that an EIS was required under 40 C.F.R. § 1501.3(d)(2)(vi).

### C.    BLM rationally found that the project would not violate FLPMA.

BLM rationally predicted that Blue and Gold would not violate federal and other laws, requirements, or policies, including FLPMA.  *See* 40 C.F.R. § 1501.3(d)(2)(iii); AR_00319-20.

BLM is required to adhere to all management direction in the 2016 RMP, including the retention of certain individual trees.  *See supra* Argument I.A.; AR_00361.  Plaintiffs, nonetheless, argue that BLM violated NEPA and an EIS was required, because Plaintiffs believe the project *may* violate that RMP provision.  *See* Pls.' Mem. 32-33. But Plaintiffs cite nothing in the administrative record showing that Blue and Gold threatens that violation.

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's claim that an EIS was required under 40 C.F.R. § 1501.3(d)(2)(iii).

### D.    BLM rationally found that the geographic characteristics of the Blue and Gold area did not require an EIS.

In assessing the NEPA significance of Blue and Gold, BLM considered the "[u]nique characteristics of the geographic area such as historic or cultural resources, parks, Tribal sacred sites, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1501.3(d)(2)(ii).  BLM

rationally found that Blue and Gold did not warrant an EIS under this factor. AR_00319.

BLM's finding is supported by the administrative record. None of the characteristics identified in the NEPA regulations are present or would be degraded by Blue and Gold. There are no park lands, prime farmlands, wild and scenic rivers, or ecologically critical areas in the project area. AR_00319. The 2016 RMP designated "areas of critical environmental concern," and none are affected by the project. *See id.*, AR_08039, AR 08053-54, AR_13227 (BLM NEPA handbook re: "unique characteristics" factor). In addition, historic/cultural sites would be avoided and "would not be impacted" during project implementation. AR_00319. Further, "[n]o wetlands would be destroyed, lost, or degraded." *Id.* Finally, there are no known, unique, or special resources that provide religious opportunities to Tribes that Blue and Gold would affect. AR_00323.

The record also supports BLM's finding of no NEPA significance, because Blue and Gold is located on O&C Act lands and involves HLB harvest in conformance with the management direction for such lands. Under the 2016 RMP, management of the HLB is expected to center on timber production and harvest (including regeneration harvest and commercial thinning). AR_07875-

78. [8]   As the FONSI noted, the activities proposed by Blue and Gold "are consistent with the types of actions anticipated to occur" under the 2016 RMP. AR_00314.  "[W]here a federal project conforms to existing land use patterns, zoning, or local plans, such conformity is evidence supporting a finding of no significant impact."  *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 861 (9th Cir. 1982).  The Blue and Gold project was designed to implement and conform to the 2016 RMP and its land-allocation direction—its "zoning."  *See* AR_00311. The record supports BLM's FONSI.

Further, BLM already accounted for the effects of HLB timber management activities across the whole RMP planning area in the 2016 FEIS, supporting its finding that another EIS was not needed for Blue and Gold.  *See* AR_00313-14 (FONSI's statement noting that BLM in the 2016 FEIS "considered the significant and potentially significant effects of conducting forest management activities" on lands including those under the Roseburg District).  "A comprehensive programmatic [EIS] generally obviates the need for a subsequent site-specific or project-specific [EIS], unless new and significant environmental impacts arise that were not previously considered."

---

[8] In sharp contrast to HLB lands, lands allocated under the 2016 RMP to LSR are managed for habitat for species listed under the ESA including the NSO and marbled murrelet.  AR_00780-83.  Blue and Gold does not involve timber harvest on LSR lands.

*Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994). Given the comprehensive programmatic analysis in the 2016 FEIS, it was rational for BLM to find that another EIS was not needed just for Blue and Gold.

Plaintiffs argue that an EIS was required under 40 C.F.R. § 1501.3(d)(2)(iii) because the Blue and Gold area includes habitat for ESA-listed species which the project will adversely affect. Pl.'s Mem. 33-34. But the NEPA significance of a project's effects on ESA species habitat is squarely assessed by a different provision —the intensity factor at 40 C.F.R. § 1501.3(d)(2)(vi). *See* AR_00321-22 (applying the ESA species/habitat factor for Blue and Gold), AR_13229 (BLM NEPA handbook, discussing the application of the ESA species/habitat factor). And even if the "unique characteristics" factor applies to ESA species/listed habitat, BLM rationally predicted that Blue and Gold would not have significant effects in this regard that required an EIS. *See* AR_00321-22; *supra* Argument III.B.

Plaintiffs rely on *Env't Prot. Info. Ctr. v. Blackwell*, 2005 WL 8176926 (E.D. Cal. May 5, 2005) but that unreported case has no persuasive authority given the Supreme Court's intervening recognition that the highest deference is required in reviewing agency predictions regarding NEPA significance. *See Seven Cnty.*, *7. *Blackwell* also involved different circumstances. There, a

project would log late-successional forest habitat and the agency attempted to unilaterally change a critical habitat designation.  2005 WL 8176926 at *1, *5.  In Blue and Gold, by contrast, BLM is not logging late-successional forest habitat or changing critical habitat designations.  It is undertaking timber harvest on O&C Act lands in the HLB that are intended and allocated for that management.

Plaintiffs, finally, rely on objectionable extra-evidence evidence for their arguments.  *See* Pls.' Mem. 33-34; *supra* Argument I.B.5, I.B.6.

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's claim that an EIS was required under 40 C.F.R. § 1501.3(d)(2)(ii).

### E.    BLM rationally found that an EIS was not required based on adverse effects to public health and safety.

BLM rationally predicted that Blue and Gold would not adversely affect public health and safety to a degree requiring an EIS.  *See* 40 C.F.R. § 1501.3(d)(2)(i); AR_00317-19.  This NEPA prediction merits the highest level of deference.  *See Seven Cnty.*, *7.

In the EA, BLM provided a site-specific analysis of the effects of Blue and Gold on fire hazard conditions and rationally explained its methodology.  AR_00417-26.  *See also* AR_00317-18 (similar discussion in FONSI).  The bottom line:  the project "would result in little change in conditions."

Page 46    Defendant's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment

AR_00425. And as BLM noted in the EA, the 2016 FEIS "provided a thorough analysis . . . regarding fire resiliency, fire resistance, fire hazard levels, and risk from residual activity fuels associated with timber management activities." AR_00417. *See* AR_08387-439 (2016 FEIS section on fire and fuels)

Plaintiffs complain that Blue and Gold will increase what is now moderate fire hazard to high fire hazard for several decades and that an EIS was therefore required. Pls.' Mem. 34. But in predicting NEPA significance, the NEPA regulation at issue expressly recognized that BLM "may" consider "the extent to which an effect is adverse at some points in time and beneficial in others." 40 C.F.R. § 1501.3(d). Here, BLM predicted that the project would ultimately bring fire hazard down to low. BLM acknowledged that the project would result in different fire hazard levels depending on post-harvest temporal period. For example, in variable retention harvest units under alternative 6— the alternative that BLM selected to implement—fire hazard would change from moderate to high and then to low over the course of time. AR_00423, AR_00318. BLM was neither arbitrary nor capricious in finding a FONSI appropriate for a project that will result in long-term fire hazard improvement.

Plaintiffs reveal that they have policy disagreements with how BLM designs harvest treatments, and with how BLM should undertake harvest regarding ensuing fire hazard levels. *See* Pls.' Mem. 34-35. But this policy

disagreement is irrelevant to NEPA. "The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Seven Cnty.*, *13 (cleaned up). NEPA "imposes no substantive environmental obligations or restrictions." *Id.* *3.

Plaintiffs rely on *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 2024 WL 2941529 (D. Or. May 24, 2024), but that case is readily distinguishable. There, a project authorized treatments over a huge area—more than 684,000 acres. *Id.* *14. Further, that project prompted "deep public disapproval and skepticism during its comment phase." *Id.* *15. There, this Court found that an EIS was required because the project was "highly controversial" under NEPA. *Id.* *16 (noting that project's impacts on "hundreds of thousands of acres"). Here, in sharp contrast, Blue and Gold is a modest local project that envisions timber harvest on less than 3,000 acres, regardless of which action alternative BLM selected. *See* AR_00359. And here, nothing in Plaintiffs' summary judgment memo—much less their specific fire hazard argument—references deep public disapproval and skepticism regarding the fire hazard effects of Blue and Gold. Further, this case does not involve the "highly controversial" NEPA significance regulation, but instead a NEPA regulation that expressly gives BLM discretion to consider the extent to which a fire hazard effect is adverse at some points and beneficial in others. 40 C.F.R. §

1501.3(d).  BLM made rational predictions regarding fire hazard and public health and safety; no EIS was required.

For these reasons, this Court should grant Defendants summary judgment against Plaintiff's claim that an EIS was required under 40 C.F.R. § 1501.3(d)(2)(i).

## CONCLUSION AND REMEDY

For the reasons above, this Court should grant Defendant summary judgment against Plaintiffs' claims and deny Plaintiffs' motion for summary judgment.

However, if this Court rules in any respect for Plaintiffs, it should order further briefing and proceedings regarding an appropriate remedy.  *See Seven Cnty.*, *9 (emphasizing that a deficiency in a NEPA review may not require a court to vacate the agency's project approval).  This Court's equitable inquiry into remedy would be informed by the scope of its ruling on the merits, so this Court should decline Plaintiffs' premature request for vacatur without any remedy proceedings.  *See* Pls.' Mem. 35.  A party seeking vacatur must demonstrate "equitable entitlement to the extraordinary remedy of a vacatur." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994).  Any remedy here would involve an exercise of the Court's equity jurisdiction and must be carefully tailored to the circumstances. *See Weinberger v. Romero-*

*Barcelo*, 456 U.S. 305, 312-13 (1982).

Any errors in the agency's analysis may prove inconsequential and, because several timber sales have been authorized and work has started without challenge from Plaintiffs, the disruptive consequences of vacatur are likely significant.

DATED this 20th day of June 2025.

Respectfully submitted,

WILLIAM M. NARUS
Acting United States Attorney
District of Oregon

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant United States Attorney
Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

The preceding memorandum complies with the applicable word-count limit under LR 7-2(b), because it comprises 10, 408 words, based on the word-count of the word processing system used to prepare the memorandum. This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, glossary, motion, signature block, and any certificates of counsel.

Dated this 20th day of June, 2025.

Respectfully submitted,

WILLIAM M. NARUS
Acting United States Attorney
District of Oregon

/s/ Sean E. Martin
SEAN E. MARTIN
Assistant U.S. Attorney