Meriel L. Darzen (OSB # 113645)
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214
meriel@crag.org | (503) 525-2725

Nicholas S. Cady (OSB # 113463)
Peter D. Jensen III (OSB # 235260)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
nick@cascwild.org | peter@cascwild.org
(541) 434-1463

John Persell (OSB # 084400)
Oregon Wild
5825 N Greeley Ave.
Portland, OR 97217
(503) 896-6472 | jp@oregonwild.org

*Attorneys for the Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

CASCADIA WILDLANDS, an Oregon
non-profit organization, **OREGON
WILD**, an Oregon non-profit organization;
and **UMPQUA WATERSHEDS**, an
Oregon non-profit organization,

|  |  |
|---|---|
| Plaintiffs, | **COMBINED RESPONSE TO RULE 59/60 MOTIONS** |
| v. | |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, a federal agency, | |
| Defendants, | Case No. 6:24-cv-01641-MTK |
| **AMERICAN FOREST RESOURCE COUNCIL** and **ASSOCIATION OF O&C COUNTIES**, | |
| Defendant-Intervenors. | |

**INTRODUCTION**

Cascadia Wildlands, Oregon Wild, and Umpqua Watersheds ("Plaintiffs") respectfully submit their response to Defendant BLM's and Defendant-Intervenors' Motions for Relief Under FED. R. CIV. P. 60 and/or FED. R. CIV. P. 59(e) ("59/60 Mot."), ECF Nos. 75 and 77.

Defendant's and Defendant-Intervenors' Rule 59(e) or 60(b) motions are inappropriate attempts to relitigate remedy and other aspects of this case. This case has been extensively briefed, and the parties have had numerous opportunities to provide this Court with argument and evidence. Defendant and Defendant-Intervenors present no "mistake" or "clear error" to justify this briefing but instead argue it is the Court or Plaintiffs' burden to establish that vacatur should apply. *See* ECF No. 75 at 7-8; ECF No. 77 at 3. These legal positions, that have already been raised in briefing before the Court and are squarely rejected by the Ninth Circuit, are not grounds for Rule 59(e) or 60(b) motions.

While logging was initiated in Galagher Canyon, Tidy Bowl, and Yellow Panther, Plaintiffs never "agreed" with or supported this logging. Rather, Plaintiffs agreed not to seek preliminary relief over these sales in exchange for BLM not logging the remainder of the project area. *See* ECF No. 23 at 4-5. Regarding Mean Mustard, Plaintiffs have reason to believe BLM illegally waived seasonal restrictions for that timber sale, and BLM has refused to provide additional information on why logging began in that sale prior to the expiration of spotted owl seasonal restrictions in July.

Regardless, the equities here plainly favor vacatur of this illegal logging project. Any logging completed up to this point is a boon to Defendant and Defendant-Intervenors, who are only paying for the logs removed. Defendant has acknowledged that the logging completed thus far has largely covered any costs incurred by the Defendant and Defendant-Intervenors. Further,

Plaintiffs agreed to a joint proposed stipulation to allow certain activities to proceed under

vacatur to wrap up initiated logging activities and mitigate the damage done there. Joint

Stipulation re: Logging Activities, ECF No. 82. The Court's entry of this generous stipulation

will dispose of any possible equitable considerations that could justify deviation from vacatur.

## LEGAL STANDARD

### I.       Rule 59/60 motions are extraordinary remedies

Amendment pursuant to Rules 59(e) or 60(b) constitutes "an extraordinary remedy, to be

used sparingly[.]" *Carroll v. Nakatani,* 342 F.3d 934, 940 (9th Cir. 2003). A motion for

reconsideration under Rule 59(e) "should not be granted, absent highly unusual circumstances,

unless the district court is presented with newly discovered evidence, committed clear error, or if

there is an intervening change in the controlling law." *McDowell v. Calderon,* 197 F.3d 1253,

1255 (9th Cir. 1999) (en banc) (internal quotations omitted); *see also Allstate Ins. Co v. Herron,*

634 F.3d 1101, 1111 (9th Cir. 2011). Similarly, Rule 60(b) provides for reconsideration only

upon a showing of "mistake[,]… newly discovered evidence[,]… [or] 'extraordinary

circumstances' which would justify relief." *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS,*

*Inc.,* 5 F.3d 1255, 1263 (9th Cir. 1993) (internal quotation omitted); *see also BLOM Bank SAL v.*

*Honickman,* 605 U.S. 204, 210 (2025). Mere disagreement with an adverse ruling does not

constitute such extraordinary circumstances. *See Canford v. Palos,* No. 1:14-cv-00242-SKO

(PC), 2014 U.S. Dist. LEXIS 60775, at *2–3 (E.D. Cal. Apr. 29, 2014) (citations omitted).

A motion for reconsideration may not be used "to raise arguments or present evidence for

the first time when they could reasonably have been raised earlier in the litigation." *Carroll,* 342

F.3d at 945 (internal citation omitted); *see also Alden v. Aecom Tech. Corp.*, No. 21-16002, 2023

U.S. App. LEXIS 6375 at *2 (9th Cir. Mar. 17, 2023). Nor is it "an avenue to re-litigate the same

issues and arguments upon which the court has already ruled." *Brown v. Kinross Gold,* U.S.A., 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005); *See also United States v. Rezzonico,* 32 F. Supp. 2d 1112, 1116 (D. Ariz. 1998) ("A motion for reconsideration should not be used to ask the court to rethink what the court had already thought through[.]").

The bar for reconsideration is particularly high where there is no new evidence or change in controlling law, in which case amendment is appropriate only in the event of "clear error or manifest injustice." *S-Tronix v. Submedia, LLC,* No. CV 08-272-PK, 2009 U.S. Dist. LEXIS 144800 (D. Or. Apr. 14, 2009) at *3; *see also United Nat. Ins. Co. v. Spectrum Worldwide, Inc.,* 555 F.3d 772, 780 (9th Cir. 2009). "For a decision to be considered clearly erroneous it must be more than just maybe right or wrong; it must be dead wrong. A movant must demonstrate a wholesale disregard, misapplication, or failure to recognize controlling precedent." *Garcia v. Biter,* 195 F. Supp. 3d 1131, 1133 (E.D. Cal. 2016) (internal quotations omitted).[1]

## ARGUMENT

### I.  The Rule 59/60 Motions are Inappropriate.

Defendant and Defendant-Intervenors' Rule 59(e) or 60(b) Motions are inappropriate attempts to relitigate remedy and other aspects of this case because they present no "mistake" or "clear error" to justify this briefing. Instead, Defendant and Defendant-Intervenors argue that the

---

[1] Defendant-Intervenors reference a Rule 59/60 Motion filed by Plaintiffs recently in ongoing litigation over the IVM logging project in southern Oregon, Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., No. 1-23-cv-00519-CL ("IVM") to assert its motion is appropriate. ECF No. 77 at 1. In IVM, after ruling for Plaintiffs, the Court recommended adoption of a remedy order which the parties interpreted in conflicting ways. The Court there has stayed Objection briefing until the Court is able to address Plaintiffs' Motion to Clarify the remedy Findings and Recommendation. IVM, ECF No. 103. The current status in *IVM* is a far cry from Defendant's and Defendant-Intervenors' attempt to use motions under FRCP 60 and/or 59 to seek reconsideration of this Court's application of the presumptive remedy here. There is no ambiguity here.

Court failed to apply a series of unnecessary remedy tests or analyses: 1) *Seven County's* remedy discussion, 2) failing to weigh the relative hardships, and 3) failing to apply the *Allied-Signal* two-part test; in essence, attempting to shift the burden of establishing whether vacatur is appropriate on to the Court or Plaintiffs. *See* ECF No. 75 at 7-8; ECF No. 77 at 3. These legal arguments are without merit, as elaborated upon below, and have already been raised in briefing before the Court. They are not grounds for Rule 59(e) or 60(b) motions.

Plaintiffs requested vacatur in their amended complaint, *see* Dkt No. 7, and Defendants argued against vacatur in their summary judgment response brief. ECF No. 29 at 49-50 (citing same caselaw and arguing "[a]ny errors in the agency's analysis may prove inconsequential and, because several timber sales have been authorized and work has started without challenge from Plaintiffs, the disruptive consequences of vacatur are likely significant." ).

Thus, Defendant already had an opportunity to discuss remedy, and did, *see* ECF No. 29 at 50, just as Plaintiffs did, *see* ECF No. 27 at 35, and any arguments it might now make "could reasonably have been raised earlier." *Carroll*, 342 F.3d at 945; *see also Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1218 (9th Cir. 2020); ECF Nos. 72 at 52–54; 76 at 31–35; 83 at 38. They cannot be raised on a motion for reconsideration. *See Carroll*, 342 F.3d at 945 ("A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time[.]"); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) (same).

And to the extent these motions present new evidence or arguments, the Court could not have committed "clear error" by declining to consider arguments Defendants declined to make. *Contra* ECF No. 92 at 8–11; *cf. Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (courts should not "manufacture arguments" for parties). It should not now indulge Defendants' demand

for a "second bite at the apple." *Campion v. Old Republic Home Prot. Co.,* No. 09-CV-748-JMA(NLS), 2011 U.S. Dist. LEXIS 54104 at *5 (S.D. Cal. May 20, 2011)); *see also Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 891 (9th Cir. 2000) (rejecting new argument that movant had "numerous opportunities" to raise earlier).

Defendant and Defendant-Intervenors now argue there should have been full "remedy proceedings," but there is nothing new in the proffered briefings and declaration that was not argued previously – *i.e.*, that the agency's analysis was inconsequential and logging has started so vacatur would be disruptive. *See* ECF No. 29 at 50.

**II.      The Court Applied the Appropriate Test for Vacatur.**

Defendant and Defendant-Intervenors do not carry their burden for reconsideration under Rule 59 or 60 for three reasons. First, the Court is not required to make explicit findings on the equities or conduct a two-step test to issue the presumptive remedy of vacatur. Second, *Seven County* does not restrain the Court's ability to vacate a project. Third, in any case, the equities here plainly weigh in favor of vacatur.

**A.  Vacatur Is the Presumptive Remedy Under the APA.**

The Court appropriately applied the default remedy of vacatur because it found that the BLM's approval of the Blue and Gold Harvest Plan violated FLPMA and NEPA. *See* ECF No. 72 at 30. The APA stipulates that a reviewing court shall "hold unlawful and *set aside*" agency action found to be arbitrary, capricious, contrary to law, or taken without observance of procedure required by law. 5 U.S.C. § 706(2) (emphasis added); *see also All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018). Thus, where an agency's "finding is not sustainable on the administrative record made, then the [] decision must be

vacated and the matter remanded [to the agency] for further consideration. *Camp v. Pitts,* 411 U.S. 138, 143 (1973).

Only in "limited circumstances" is remand without vacatur appropriate. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Therefore, as this Court explained, "[t]he presumptive remedy . . . is *vacatur* and remand."  ECF No. 72 at 30 (emphasis in original); *Ctr. for Food Safety v. Vilsack,* 743 F. Supp. 2d 948, 951 (N.D. Cal 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury."). Only when determining whether a case presents one of the "limited" or "rare" circumstances where remand *without* vacatur may be appropriate do courts consider the (1) "seriousness of the agency's errors" and (2) "the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council*, 806 F.3d at 532; *Cal. Cmtys*. *Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).

### B.  The Court Was Not Required to Apply the *Allied-Signal* Test to Vacate.

Defendant and Defendant-Intervenors argue that the Court needed to apply the *Allied-Signal* equities test to properly vacate the timber sale authorization here. ECF No. 75 at 7 ("A district court errs 'by failing to weigh the relative hardships that will result from granting or withholding a particular equitable remedy.'") (citing *Miller for and on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr*., 991 F.2d 536, 544 (9th Cir. 1993); ECF No. 77 at 3 ("the Court failed to apply the mandatory two-part test for whether an agency action should be vacated."). Defendant and Defendant-Intervenors do not provide any case law to support this assertion. Defendant cites *Miller for and on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr*., but this case concerns the balancing of the equities in the context of issuance of a preliminary injunction under section 10(j) of the

National Labor Relations Act. *Id.* at 539-44. It does not stand for or discuss whether a Court's failure to explicitly weigh the equities in vacating an illegal decision under the APA is reversible error. *Id.* Defendants also cite *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship* for the proposition that "party seeking vacatur must demonstrate 'equitable entitlement to the extraordinary remedy of a vacatur.'" ECF No. 29 at 49; ECF No. 75 at 7 (*citing U.S. Bancorp Mortg. Co.*, 513 U.S. at 26). That case concerns the vacatur of a Court decision, not agency action under the APA and is inapposite.

Similarly, Defendant-Intervenors cite *350 Montana v. Haaland* for the proposition that "the Court must weigh the seriousness of the agency's errors against the disruptive consequences of vacatur." ECF No. 77 at 9. This is wrong. The Court in *350 Montana* reiterated that "vacatur is the presumptive remedy," but remanded to the district court to engage in fact-finding over the question of vacatur because it was unclear from the record whether the agency could address the procedural legal violations in a different way after vacatur, and thus "there was a dearth of evidence concerning the impact of vacatur." 50 F.4th 1254, 1273 (9th Cir. 2022). This unusual situation simply is not relevant here, nor does it stand for the proposition cited.

Further, the position that the District Court carries the burden of establishing that vacatur is appropriate, conflicts with *Allied-Signal* caselaw establishing that this burden lies with the party opposing vacatur. *See W. Watersheds Projects v. Zinke,* 441 F. Supp. 3d 1042, 1083 (D. Idaho 2020); *see also Ctr. for Envtl. Health v. Vilsack,* No. 15-cv-01690-JSC, 2016 LX 24101 (N.D. Cal. June 20, 2016*),* at *41 (N.D. Cal. June 20, 2016) ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted").

Finally, Courts have repeatedly vacated challenged agency actions without applying the test Defendant and Defendant-Intervenors argue is required. *See Humane Soc'y of the United States v. Locke,* 626 F.3d 1040 (9th Cir. 2010); *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 34 F.4th 850, 882 (9th Cir. 2002); *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 382-83 (D.C. Cir. 2026); *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020); *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024).

### C.  *Seven County*'s Discussion of Vacatur Is Dicta and Does Not Alter the Ninth Circuit's APA Remedy Presumption.

Further, Defendant argues that the Court erred by failing to address *Seven County*'s "analysis of appropriate remedies," but such analysis is unnecessary and irrelevant. ECF No. 75 at 6. First, *Seven County*'s discussion of remedies is dicta because the Court ruled against conservation Plaintiffs. *Seven County Infrastructure Coal. v. Eagle Cnty., Colo.,* 605 U.S. 168, 183 (2025). Dicta, a statement made during the course of an opinion on which the judgement does not rest, is "unnecessary" and "not precedential." *Best Life Assur. Co. of California v. C.I.R.*, 281 F.3d 828, 834 (9th Cir. 2002) (quoting *Black's Law Dictionary 1100* (7th ed. 1999)). Neither the Ninth Circuit nor this District Court have relied on *Seven County* in its remedy analysis as Defendant suggests and they need not start now. *Compare with Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 994 (9th Cir 2025) (citing *Seven County* to explain that judicial review of agency action must be deferential); *Friends of Animals v. Burgum*, 164 F.4th 738, 750 (9th Cir. 2026) (same); *City of Culver City v. Fed. Aviation Admin.,* 167 F.4th 1260, 1263 (9th Cir. 2026) ("NEPA . . . simply requires an agency to prepare an [EIS]. . . .") (internal quotations omitted); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* No. 3:01-cv-640-SI, 2026 LX 185238 at *11 (D. Or. Feb. 26, 2026) (D. Or. Mar. 26, 2026) (citing *Seven*

*County* to explain that (1) NEPA "imposes no substantive environmental obligations or restrictions" and (2) courts owe agencies deference in NEPA review) (internal citation omitted); *Sakr v. City of Portland*, No. 3:24-cv-01265-AN, 2026 LX 29975 at *8 (D. Or. Feb. 18, 2026) (same).

Second, as discussed above, the Ninth Circuit has long recognized and applied the exception to vacatur discussed in *Seven County.* 605 U.S. at 185; *see, e.g.*, *Pollinator Stewardship Council*, 806 F.3d at 532. This exception is simply inapplicable here as elaborated upon below. Rather, *Seven County*'s judgement rested on NEPA's requirements for agencies— not the adequate remedy for NEPA violations. *Seven County*, 605 U.S. at 183. Here, the Court properly cited and applied *Seven County* in the context of Plaintiffs' NEPA claims. *See* ECF No. 72 at 30.

### III.    The Equities Clearly Favor Vacatur.

#### A.  BLM's Errors Are Serious.

Weighing the seriousness of the agency's errors against the disruptive consequences of vacatur plainly favors vacatur here. *350 Montana*, 50 F.4th at 1273. When remedying a violation of a statute, the courts have a duty to vindicate the underlying purposes to be served by the statute. *See Amoco Prod. Co. v. of Gambell*, 480 U.S. 531, 542-543 (1987). The seriousness of BLM's error "should be measured by the effect the error has in contravening the purpose of the statue in question." *Or. Natural Desert Ass'n. v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017).

Here, the violated statute is the FLPMA, which governs BLM's management of federal public lands. More specifically it states a policy that:

> [P]ublic lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife

and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

To manage for this variety of values, FLPMA requires BLM to prepare Resource Management Plans ("RMPs") and to ensure that site-specific management actions area consistent with and conform to the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b); 1610.5-3(a); *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (observing that the statutory directive in 43 U.S.C. § 1732(a) "prevent[s] BLM from taking actions inconsistent with the provisions of a land use plan.").

Here, BLM elected to protect old-growth trees as part of its satisfaction of that multiple use mandate. This is not a procedural requirement, but a substantive protection enshrined in the RMP's management directions. *See* ECF No. 72 at 5 (citing AR7876).

In their efforts to downplay the Court's ruling, Defendant and Defendant-Intervenors argue that the "errors identified in the Order are strictly procedural based on the insufficiency of the BLM's explanation concerning the identification and preservation of Protected Trees." ECF No. 77 at 13; ECF No. 75 ("There is no good reason to believe that BLM, through a new decision, would elect not to harvest these designated timberlands."). These statements are emblematic of BLM's continued failure to grasp the problem with its assumption that every acre of Harvest Land Base ("HLB") should be logged regardless. *See Wildlands v. Adcock,* No. 6:22-cv-767-AA (D.Or., Mar 31, 2025*)*. Here, the Court found that BLM's reliance on the FOI average stand-age data to conclude that logging was appropriate in these areas, given the RMP's protection of old-growth trees, was illegal. ECF No. 72 at 25. The Court found BLM's stand ages were contradicted by its own data and "factually inaccurate" compared to on-the-ground

observations. *Id.* at 20-25. BLM failed to discuss how it would protect old growth or how its plan to "extract millions of board feet from the Plan Area would affect the protected trees." *Id.* at 25. As the Supreme Court has explained, if an agency's "finding is not sustainable on the administrative record made, then the [] decision must be vacated and the matter remanded [to the agency] for further consideration. *Camp v. Pitts,* 411 U.S. 138, 143 (1973).

Proper consideration of these errors could not possibly lead BLM to the same decision made previously because, as the Court highlights, numerous timber sale units, plots, and large forest tracts authorized for logging under Blue and Gold are "contiguous, previously unlogged mature and old-growth forests." *See* ECF No. 21-22. BLM's decision to log these areas despite the RMP's prohibition on logging old-growth is irreconcilable. As the Ninth Circuit recently explained in light of BLM's failure to prioritize oil and gas leases outside of sage grouse habitat:

> "it is quite possible that some of the parcels sold could again be offered under an updated Memorandum consistently with the Prioritization Objective. Nevertheless, a lease sale that consists exclusively of parcels within sage-grouse habitat, where the agency made no effort to direct or encourage development in sage-grouse parcels, does not comply with the Prioritization Objective. Accordingly, a lease sale that adequately effectuates the Objective would also certainly have a different composition than the June 2018 sale. The seriousness of the government's error is therefore significant."

*See Mont. Wildlife Fed'n v. Haaland,* 127 F.4th 1, 51 (9th Cir. 2025). Thus, even if some of the Blue and Gold units could move forward under a new decision because they targeted younger forests, a new decision here by BLM that adequately takes into considerations these areas dominated by old growth, potentially "53% of the proposed unit acres of the project," would certainly be different than originally planned. *See* ECF No. 72 at 22. Therefore, BLM's errors are serious.

Defendant-Intervenors argue that BLM has subsequently cured the legal violations found by this Court through its submitted extra-record declarations. ECF No. 77 at 3 ("relevant extra-

record evidence which provides assurances that, not only are Protected Trees being retained in the Blue and Gold Plan area, but the BLM is applying a *more-restrictive* standard by ordering sale purchasers to retain all reserve trees ≥ 40" DBH *regardless of their age.*"). First, this is untrue. BLM gave instructions to the purchaser of the Mean Mustard timber sale to "report any 40+ inch diameter-at-breast-height ('DBH') reserve tree cut," but this reporting requirement was related to the Mean Mustard purchasers alone, and only enacted after BLM documented old-growth trees marked for retention were being cut down. *See* ECF No. 76 at 13; ECF No. 76-2 at 1-3. A 40-inch DBH *reserve tree* reporting requirement does not affect whether old growth is being appropriately reserved in these units and how BLM is determining "whether [trees] were established prior to 1850," or the problem associated with BLM failing to "acknowledge the existence of protected trees," "provide any information as to how it would protect them," or analyze how the proposed logging would "affect the protected trees." ECF No. 72 at 23.[2] It is also unique to this sale and applied at BLM's discretion.

In fact, if anything, this *post hoc* information in the Krueger Declaration provides factual support that these errors are serious and amount to old growth being logged and felled because of BLM's decision. *See* ECF No. 76-2; *See* ECF No. 66, 67. Even after admitting reserve trees are being logged (not even considering the trees not properly being reserved by BLM), Defendant maintains "that no trees have been cut in violation of the RMP individual tree retention provision." ECF No. 75 at 12. This alone strongly counsels against a remand-only order because as Plaintiffs have consistently argued, there was simply no way to log these ancient forests

---

[2] It is extremely concerning that the only method BLM has provided concerning tree aging, aside from improperly relying on the FOI average stand age data, is counting the rings of trees already logged. *See* ECF No. 76 ¶¶ 21-23. Making *post hoc*, unreviewable estimations about tree age after they have already been cut down cannot possibly cure the legal violations found here.

without felling the old growth, and "BLM failed to take a hard look at the existence of protected old-growth trees in the Plan's stands and the Plan's effects on those trees." ECF No. 72 at 22, 27.

### B. Vacatur Is Not Highly Disruptive.

Vacatur in this case will not have any "highly disruptive" consequences, because it will maintain the status quo. In environmental cases, the "rare circumstance" in which equity mitigates against vacatur involve situations where vacating the decision would *harm the environment* and not serve the underlying purposes of the statute in question. *See Cal. Cmtys.,* 688 F.3d at 991-02*; Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401-05 (9th Cir. 1995) (leaving unlawful ESA listing rule in place to protect imperiled snail until new listing rule is completed).

Defendant argues that vacatur is highly disruptive because these are HLB lands, and a primary objective of these lands is to produce timber. ECF No. 75 at 8-9. This context was plainly discussed by the Court in its Opinion and Order. As the Court explained, "[n]otwithstanding the RMP's direction to harvest timber on HLB lands, it also directs BLM to '[m]aintain stand densities . . . to promote stand vigor and health," and retain "all trees that are both ≥ 40" DBH [diameter at breast height] and that the BLM identifies were established prior to 1850." ECF No. 72 at 5 (citing AR7876). "Accordingly, though HLB land is primarily designated for timber production, BLM must act 'consistent with management direction' and 'may elect to defer harvest . . . for reasons described in the management direction . . . .' AR_07920–21." ECF No. 72 at 5.

The Court simply held BLM accountable to its own plan standards, a plan developed recently to explicitly comply with the O&C Act. AR7821; *see* ECF No. 75 at 10. Defendant suggests that vacatur of this specific sale would frustrate compliance with the O&C Act, ECF

No. 75 at 9-10, but as Judge McShane has explained, the O&C blueberries are already baked into the 2016 RMP pancake. *See Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146 (D. Or. 2019) (referencing poor analogies used by Plaintiffs at oral argument).

Defendant and Defendant-Intervenors point to economic costs associated with vacatur as highly disruptive. "Economic disruption weighs against vacatur under certain circumstances," examples include the delay of a "much needed power plant," a billion-dollar venture employing 350 workers. *Montana Wildlife Fed'n.*, 127 F.4th at 51 (citing *Cal. Cmtys.,* 688 F.3d at 993-4). In *Montana Wildlife Federation*, the Ninth Circuit declined to deviate from vacatur despite it cancelling 158 leases and requiring the return of around 36 million dollars in lease revenues to the purchasers, because "the only way for the agency to effectuate the Objective, and therefore comply with its obligations under FLPMA, would be to redo the lease sale from scratch." 127 F.4th at 51.

The situation here pales in comparison to those in which courts have not vacated illegal decisions. Here, Defendant-Intervenors claim that vacatur will be highly disruptive because its members have "invested millions of dollars" into a number of these partially implemented timber sales and needs to complete these sales to "recover their investments." ECF No. 77 at 15. This representation is at best disingenuous, if not objectively false.  BLM asserts that "the United States is liable for the purchaser's actual costs that have not been recovered through the value of timber that was removed," not the purchaser. ECF No. 76 at 8. Additionally, BLM admits that for Galagher Canyon, Tidy Bowl, and Yellow Panther, "due to the necessary sequence of operations, most of the cost associated with final road maintenance, soil amelioration, and fire hazard reduction has been paid for with the value of the timber already removed from these three sale areas." ECF No. 76 at 12. Thus, the representation that "Mark Jones Trucking, Inc. will be

forced to take out a loan to pay for its sunk costs in the Galagher Canyon sale" is suspect. ECF No. 77 at 15.

Also, the implication that these "investments" are actual irrecoverable costs is disingenuous. First, these purchasers are only paying for the "stumpage value of severed timber," meaning that full contract prices are a disingenuous way to portray the financial costs of vacatur. ECF No. 76 at 11 ("payment is received in full for the stumpage value of the severed timber"). None of the submitted declarations from Defendant-Intervenors discuss how much timber volume has been removed and sold or its fair market value, and BLM has made statements saying that "most of the costs" associated with Galagher Canyon, Tidy Bowl, and Yellow Panther have been paid for with the value of timber already removed. ECF No. 76 at 12. Second, a substantial portion of these proffered costs are performance and bid bonds, which will be returned to the purchaser given the Government's failure to perform.

Additionally, all of these logging activities were purchased and initiated after this lawsuit was filed. The purchasers were well aware of this legal challenge and assumed the risks that the Court would issue such a ruling and even had substantial heads up about the timing of such a ruling. *See* ECF No. 42. By proceeding with logging after the lawsuit was filed, the purchasers assumed the risk of economic disruption associated with the Court's decision. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017) ("Defendants' cri de coeur over lost profits and industrial inconvenience is not fully convincing. Such is the nature of doing business, especially in an area fraught with bureaucracy and litigation. Dakota Access began pumping oil into the pipeline with full knowledge that Plaintiffs were contesting the easement allowing them to do so. By nonetheless proceeding with its venture, the company assumed some risk of economic disruption.").

Further, the purchasers could have contractual remedies against BLM that these companies have not hesitated to pursue in the past. *See Seneca Sawmill Co. v. United States*, No. 16-1001C (Fed. Cl. July 02, 2020).

In any case, the Ninth Circuit routinely vacates unlawful agency action that would cause adverse environmental harm, even if there are adverse economic effects of vacatur on agencies or private parties. *See*, *e.g.*, *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1111–12 (9th Cir. 2016) (vacating Record of Decision for mine upon finding NEPA analysis unlawful); *Pollinator Stewardship Council*, 806 F.3d at 532–33 (vacating agency's approval of powerful new agricultural insecticides); *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1128 (9th Cir. 2012) (vacating decision authorizing gas pipeline upon finding NEPA and ESA violations); *N. Plains Res. Council*, *Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072, 1100 (9th Cir. 2011) (vacating approvals authorizing construction of a 130-mile railroad line to haul coal upon finding NEPA violations); *Se. Alaska Conserv. Council v. Fed. Hwy. Admin.*, 649 F.3d 1050, 1054–56, 1059 (9th Cir. 2011) (vacating decision approving a new highway and ferry terminal upon finding NEPA violations); *Humane Soc'y*, 626 F.3d at 1048, 1053 n.7 (vacating permits that might result in temporarily increased predation by sea lions on protected fish); *Pit River Tribe*, 469 F.3d 768, 773, 784, 788 (9th Cir. 2006) (vacating lease extensions that would have allowed geothermal projects throughout 266,800 acres of national forest land upon finding NEPA violations); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) (vacating service contracts that supplied water to irrigation and water districts); *Envvtl. Def. Ctr.*, 34 F.4th at 882 (vacating an EA based on the presumptive remedy for agency action that violates the NEPA as reviewed through APA).

In fact, the Ninth Circuit has found in the logging context that very similar situations warrant vacatur: "commercial thinning is authorized on a large portion of the Project Area. Adams County has not addressed any of these potential environmental harms, such as the unexplained absence of 'old forest habitat' on the Project area, and therefore has not overcome the presumption of *vacatur*." *All. for the Wild Rockies*, 907 F.3d at 1121-21 (citing *Alsea Valley All.,* 358 F.3d 1181, 1185 (9th Cir. 2004); and *Pollinator Stewardship Council*, 806 F.3d at 532); *see also Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2022) ("If the Forest Plan's standards is invalid, or is not being met, then the timber sales that depend on it to comply with the Forest Act are not in accordance with the law and must be set aside").

## IV.    Narrowed Vacatur Is Not Warranted.

Defendant and Defendant-Intervenors request narrowed vacatur relief, asking the Court to remand with various instructions to BLM to "describe its process by which it measures a tree's DBH or determine whether a tree was established prior to 1850." ECF No. 75 at 11, ECF No. 77 at 16. What these suggestions ignore is that BLM failed to factor the extensive presence of old growth into its analysis and decision to log these areas. The presence of this old growth will change units, change volume estimates, change timber sale contracts; having BLM explain "how it will preserve Protected Trees" does not address this at all. ECF No. 77 at 16. Even if BLM were to issue a 40-inch diameter limit now, BLM would be constantly chasing replacement volume for these trees during implementation, leading to more severe effects than disclosed in the EA. AR12-14. BLM's decision to log this area was based on erroneous stand age data and stand descriptions that would have largely circumvented the RMP's old-growth protections. This "'fundamental' nature of the government's error would make it infeasible for the agency to keep [the current logging project] in place on remand." *Mont. Wildlife Fed'n*, 127 F.4th at 51.

**V.      The Parties Have Agreed on Appropriate Closeout Activities.**

The parties' proposed stipulation, ECF No. 82, will allow activities that will reduce fire risk, minimize waste of forest resources, protect road infrastructure and water quality, and minimize financial complications associated with the associated timber sale contracts, while not necessitating any modification of the Court's Opinion and Order. *See* ECF No. 75 at 13-14. Plaintiffs agreed to propose that these activities move forward because this work will help undo some of the ecological harm that occurred, remove large, decked piles of timber from the forest, and stabilize/decommission the roads and landings that were built. Plaintiffs were also mindful that the purchasers had invested money into these sales, and equity principles would counsel in favor of them being able to sell already felled timber.

**CONCLUSION**

Defendant's and Defendant-Intervenors' Motions for Relief Under FED. R. CIV. P. 60 and/or FED. R. CIV. P. 59(e) should be denied because the Court did not make any "mistake" or "clear error" by vacating and remanding the Blue and Gold Project EA, FONSI, and Decision Records. The Court found that the Blue and Gold Plan violated NEPA and FLPMA, applied the presumptive remedy for APA violations, and implicitly weighed the equities.

Respectfully submitted this 2nd day of June, 2026.


/s/ Nicholas Cady
Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463 | Email: nick@cascwild.org

Meriel Darzen, OSB # OSB # 113645
503-227-2212 | meriel@crag.org
Crag Law Center
3141 E. Burnside St.

Portland, Oregon 97214
Fax: (503) 296-5454

John Persell (OSB # 084400)
Oregon Wild
5825 N Greeley Ave.
Portland, OR 97217
(503) 896-6472 | jp@oregonwild.org
*Attorneys for Plaintiffs*